## IN THE UNITED STATES DISTRICT COURT
## FOR THE ESTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| DEBORA D. TANNER, et al. | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | |
| | ) | **Case No. 4:11-CV-01361-NAB** |
| CITY OF SULLIVAN, et al. | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### REPORT OF JAIL OPERATIONS EXPERT JEFF EISER

1.    I was retained to provide expert testimony and opinions concerning the incarceration of Karen A. Palmer in the Sullivan Police Department Jail located in Sullivan, Missouri during the time period of October 16-17, 2009.  Specifically, I have been asked to provide my professional opinions pertaining to contemporary jail industry standards and practices as they relate to the operational procedures and practices of the Sullivan Police Department Jail while Ms. Palmer was incarcerated and the duties and responsibilities of the Sullivan Police Department Jail and its staff to protect her from harm while she was in their custody.

2.    My professional opinions are a function of the unique facts and circumstances in this case and are based on my training, education, practical experience and the contemporary jail industry standards and practices that existed at the time of the incident, specifically; the Standards for Adult Local Detention Facilities (4th Edition; June 2004) and the Standards for Small Jail Facilities (January 1989) promulgated by

Def.'s Ex. A

the American Correctional Association and the <u>Standards for Health Services in Jails</u> promulgated by the National Commission on Correctional Health Care (2008).

3.     I have over 29 years of practical work experience in the operation and administration of one of the largest local corrections systems in the United States.  I also have extensive experience and expertise in the operation and staffing of small, medium and large jail facilities.  I have written extensively on the subject of jail administration as co-author of the <u>Ohio Jail Administrator's Handbook</u>, in conjunction with the Ohio Bureau of Adult Detention and I have personally researched and authored a large part of the curriculum used by the Ohio Peace Officer Training Council to certify corrections officers, supervisors and jail administrators.

4.     Since 2002, I have been an adjunct instructor of criminal justice in the College of Evening and Continuing Education at the University of Cincinnati.  I have been retained as a consultant and trainer for small, medium and large jails and have participated as an instructor at national training seminars for the American Jail Association and the National Institute of Corrections – U.S. Department of Justice.  I graduated with a Bachelor of Science Degree in Criminal Justice from the University of Dayton in 1980 and I earned my Master's Degree in Education from Xavier University (Cincinnati, Ohio) in 2011.  My experience in jail operations, jail administration and jail staff training has made me familiar with the basic standard of care which applies to jails such as the one in Sullivan, Missouri in 2009.  My resume/curriculum vitae, fee schedule, list of publications and a list of cases in which I have been retained as a jail operations expert in the last 4 years, are attached hereto.

5.    I have testified as a jail operations expert in civil rights and tort litigation since 1994 for defendants and plaintiffs. My expertise is in all areas of jail facility operations including: staffing, inmate assault (failure to protect), staff use-of-force, prisoner access to medical and mental health care, in-custody deaths, inmate suicide, sexual assault by staff/other prisoner, conditions of confinement, inmate supervision, inmate booking, classification and housing, strip/body cavity searches, jail records procedures, jail policies and procedures, and the training of correctional staff, supervisors and administrators.

6.    The preliminary opinions that I set forth at the end of this report are based on my education, training, experience and review of the documents and video evidence listed below:

a.    Amended Complaint.

b.    Proposed Second Amended Complaint.

c.    Postmortem Examination of Karen A. Palmer.

d.    Missouri State Highway Patrol Investigation report on the death of Karen Palmer.

e.    Sullivan Police Department General Order #0007 entitled "Temporary Holding Facilities" (SPD 000488 – 000491).

f.    Sullivan Police Department policy entitled "Closed Circuit TV System Policy" (SPD 000348)

g.    Sullivan Police Department policy entitled "21- Temporary Holding Facilities" (SPD 000419 – 000424).

h.   Plaintiffs' First Request for Production of Documents Directed to Defendants.

i.   Plaintiffs' First Interrogatories Directed to Defendants.

j.   Defendants' Responses and Objections to Plaintiffs' First Request for Production of Documents

k.   Defendant City of Sullivan's Responses and Objections to Plaintiffs' First Interrogatories.

l.   Defendant City of Sullivan's First Supplemental Responses to Plaintiffs' First Interrogatories.

m.   Defendant Donald Reed's Responses and Objections to Plaintiffs' First Interrogatories.

n.   Defendant Donald Reed's First Supplemental Responses to Plaintiffs' First Interrogatories.

o.   Defendant Darrin Jones' Responses and Objections to Plaintiffs' First Interrogatories.

p.   Defendant Kevin Halbert's Responses and Objections to Plaintiffs' First Interrogatories.

q.   Plaintiffs' Second Request for Production of Documents Directed to Defendants (February 8, 2012).

r.   Defendants' Responses to Plaintiffs' Second Request for Production of Documents Directed to Defendants (Radio/Transmitter Log; End of Shift Log/Briefing Book).

4

s.     Plaintiffs' Second Request for Production of Documents Directed

       to Defendants (February 17, 2012).

t.     Defendants' Responses and Objections to Plaintiffs' Second

       Request for Production of Documents Directed to Defendants

       (Chief Counts' Calendar; Sullivan Police Department current

       policies and procedures; City of Sullivan Green Book)

u.     Defendants' Rule 26(a) Initial Disclosures.

v.     Deposition of Darrin Jones

w.     Deposition of Don Reed

x.     Deposition of Patrick Johnson

y.     Deposition of Jeffrey Rohrer

z.     Deposition of Robert Hines

aa.    Deposition of Scott Connor

bb.    Deposition of Shaun Hinson

cc.    Deposition of Kevin Halbert

dd.    Deposition of David Roche

ee.    Deposition of Chief George Counts

ff.    Deposition of Vernon Zelch

gg.    Deposition of Scott Mertens

hh.    CD-R labeled Karen Palmer containing six (6) video segments

       entitled:

            1.  Cell Camera 10.15-10.48

            2.  Cell Camera 10.48-11.19

        3.  Cell Camera 11.19-11.50

        4.  Cell Camera 11.50-12.24

        5.  Hall Camera 12.10-12.20

        6.  PALMER

ii.      CD-R labeled "Inspection of Sullivan Police Department Headquarters".

jj.      CD-R  containing files entitled:

        1.  SPD_1-179 (Report of Arrests and Prosecutions of Karen Palmer)

        2.  SPD_180-184 (List of arrests from 10-10-09 to 10-18-09)

        3.  SPD_248-606 (Sullivan Police Department's Administrative Manual for Field Training and Evaluation Program)

        4.  SPD_732-791 (Death Investigation of Karen Palmer)

        5.  SPD_841-842 (Disc containing one video file; Disc containing five video files)

        6.  SPD_185-209 (List of staff working between 10-07-09 to 10-20-09)

        7.  SPD_210-247 (Sullivan Police Department's Administrative Manual for Field Training and Evaluation Program)

Intake) is vitally important to protect inmates from harm and must include a proper

intake medical and mental health screening and a proper search of the prisoner to

ensure dangerous items are removed before they are placed in a holding cell.

8.    Ms. Karen A. Palmer was arrested on 10/16/09 at 1031 hours by Sgt. Jeff Rohrer

of the Sullivan (MO) Police Department on an active warrant for failing to appear on

a charge of Trespassing. Sgt. Rohrer was investigating a complaint from Christina

Smith that Ms. Palmer had taken a prescription bottle of Hydrocol/APAP from her

residence. Ms. Palmer was taken to the Sullivan Police Department Headquarters and

questioned by Sgt. Rohrer concerning the missing prescription medication. Ms.

Palmer initially denied any knowledge of the missing pills. Sgt. Rohrer requested that

Ms. Palmer talk to Detective David Roche about the missing medication and she was

transported to his office. After speaking to Det. Roche for a few minutes she admitted

stealing the medication. Ms. Palmer advised that before she got home from Ms.

Smith's house she dumped the pills in her wallet and threw the empty pill bottle out

the car window.  Ms. Palmer agreed to show Sgt. Rohrer where she threw the bottle

and retrieve the pills from her residence. Sgt. Rohrer accompanied by Officer Reed

was able to locate the pill bottle and the wallet containing the stolen medication. Ms.

Palmer gave a voluntary written statement to Sgt. Rohrer where she stated that "I

stole a bottle of loratabs" and "I have much remorse for the incident that happened

this morning. I'm scared and I don't want to go back to prison. So I will cooperate as

much as I can."  Ms. Palmer was then processed into the jail, her property and

medications were cataloged. Her medical record noted that she answered "yes" when

asked if she had ever been treated for "asthma" and "drug addiction".  The record

8

indicates that at 1339 hours her fingerprints were taken and according to deposition testimony at some point after 1500 hours Ms. Palmer was housed in Cell #4 of the female unit. Sgt. Rohrer, Officer Reed and Officer Hinson were involved in the intake processing of Ms. Palmer. The female unit was located behind a solid metal door which isolated the female prisoners (sight and sound) from everyone else in the jail, there were no other female inmates housed at that time of Ms. Palmer's assignment to Cell #4. A single video camera was attached on the wall across from each cell which was displayed on a monitor in the communications control center and a small intercom box was mounted on the same wall. No strip search was indicated in the record and she was allowed to retain her sweatpants, tee shirt and pink hooded sweatshirt in her cell. The only observations recorded of Ms. Palmer after entry into the cell were medication distributions on 10/17/09 at 0040 hours and 0755 hours.

The video footage for 10/16/09 and the majority of 10/17/09 was not preserved and was unavailable for review. The video portions I was able to review from 10/17/09 beginning at 0907 hours show Ms. Palmer with her back to the camera for a period of approximately 40 minutes. The death investigation report indicates that during this time she was attempting to cut on her arm with a broken plastic fork. At 1016 hours the video shows Ms. Palmer stepping on a stool by cell door and tying the end of a string around the cell cage and the other end around her neck. The department policy required communications officer to observe each prisoner on the video monitor every ten (10) minutes. The Communications Officer on duty the morning of 10/17/09 was Supervisor of the Communications Division Kevin Halbert. According to Missouri State Highway Patrol Investigator Mertens' report Kevin

9

Halbert stated due to additional duties he did not see Ms. Palmer's actions. On 10/17/09 at 1215 hours Officer Darrin Jones went to the female side and discovered Ms. Palmer hanging. EMS personnel arrived at 1220 hours and pronounced her dead.

9.     I started my review of this case by analyzing the department policies, procedures and training in the area of prisoner suicide recognition and prevention. Based upon my training, education and experience it is a well known and long established standard in the jail industry that in order to adequately protect prisoners from harm, a jail must have adequate policies, procedures and training in place to direct staff in the intake, screening, identifying, monitoring and supervising of a suicide-prone inmates. The Sullivan Police Department and Police Chief Counts recognized the need to provide for the safety and well-being of detainees. General Order #7, effective 1/1/97, required that all holding facility personnel were to receive training regarding the searching and booking of prisoners. The deposition testimony makes clear that the holding facility personnel did not receive adequate training. Additionally, the directive in General Order #7 that the Chief of Police "develop contingency plans and procedures for suicide prevention" indicates Chief Counts' recognition that existing procedures were inadequate. Despite this Chief Counts admits that no such procedures were developed and put into place at the time of Karen Palmer's death. Therefore, the lack of any policy, procedure or staff training in the recognition and prevention of prisoner suicides created an obvious risk to the safety of pre-trial detainee Karen Palmer in violation of the Sullivan Police Department General Orders and ACA Standard **4-ALDF-4C-32**, which requires:

**4-ALDF- 4C-32:** "A suicide prevention program is approved by the health authority and reviewed by the facility administrator. It includes specific procedures for handling intake, screening, identifying, and supervising of a suicide-prone inmate and is signed and reviewed annually. All staff with responsibility for inmate supervision are trained on an annual basis in the implementation of the program. Training includes but is not limited to:

- Identifying the warning signs and symptoms of impending suicidal behavior
- Understanding the demographic and cultural parameters of suicidal behavior, including incidence and variations in precipitating factors
- Responding to suicidal and depressed inmates
- Communicating between correctional and health care personnel
- Using referral procedures
- Housing observation and suicide-watch level procedures
- Follow-up monitoring of inmates who make a suicide attempt

10.     Another basic responsibility of the City of Sullivan (MO) and Chief Counts in protecting pre-trial detainee Karen Palmer from harm was to perform adequate medical/mental health screening during her admission to the facility. Based upon my training, education and experience it is a well known and long established standard in the jail industry that the jail must perform adequate medical/mental health screening and access to adequate medical/mental health treatment. The critical first step in this

process is to perform an adequate medical/mental health screening for all new prisoners. The National Commission on Correctional Health Care (2008) has stated,

> "Receiving screening is a process of structured inquiry and observation designed to prevent newly arrived inmates who pose a threat to their own or others' health and safety from being admitted to the facility's general population. It is intended to identify potential emergency situations among new arrivals and to ensure that prisoners with known illnesses and currently on medications are identified for further assessment and treatment. Screeners are to make adequate efforts to explore the potential for suicide. Both reviewing with the inmate any history of suicidal behavior and visually observing the inmate's behavior are done. In addition, the potential for exhibiting symptoms of withdrawal from alcohol and other drugs is investigated. These approaches, coupled with training in aspects of mental health and chemical dependency, enable staff to intervene early to treat withdrawal and to prevent most suicides."

Chief Counts' deposition testimony indicates the current custom and practice of determining which prisoners may be at risk for suicide as:

   a.  catching the prisoner in an act of self-harm;

   b.  a prisoner voluntarily stating they are going to harm themselves;

   c.  or "you look at them and determine".

In his deposition Chief Counts admits that his policy on the medical/mental health screening of new inmates is inadequate, despite the recognition that the holding facility is not equipped to handle suicidal detainees. By failing to take some action to correct the deficiency in his policy he has created a serious risk for all new prisoners

12

and guaranteed that serious medical and mental health issues would go undetected in his jail. Since the City of Sullivan (MO) and Chief Counts have no adequate written policy, the staff lacks the direction and training necessary to perform an adequate medical/mental health screenings in violation of ACA **Standards SJ-147** and **4-ALDF-4C-22**, which require:

> **SJ-147:** "Written policy and procedure require medical screening to be performed by health-trained staff on all inmates on arrival at the facility. Includes inquiry into:
>
> > - past and present treatment or hospitalization for mental disturbance or suicide
> >
> > -Use of alcohol and other drugs"
>
> **4-ALDF-4C-22:** "Intake medical screening for inmates commences upon the inmate's arrival at the facility and is performed by health-trained or qualified health care personnel."

11.    Another critical part of the processing of new inmates is a thorough custodial search before assignment to a housing cell. A thorough search consists of an inspection of the clothing and body of the inmate. It is accomplished by use of the hands to feel for drugs, weapons or other contraband. Especially important is the examination of any clothing items that the inmate is allowed to keep while incarcerated. In the case of Karen Palmer it was especially important to perform a thorough custodial search because of her known history of drug abuse. Department policy, procedure and training should give all staff specific and consistent guidelines to follow at all times. In reviewing the depositions in this case it becomes clear that

officers involved in the processing of Karen Palmer seemed confused about how to perform a thorough custodial search, especially of the garments that Ms. Palmer was allowed to keep in her cell. Departmental policy required that all items "that may be used to create a ligature shall be taken from all prisoners". Sgt. Rohrer, Officer Don Reed and Officer Shaun Hinson allowed Ms. Palmer to retain a hooded sweatshirt that contained a string, the same string that was used by Ms. Palmer to hang herself in her cell on 10/17/09.

12.   There is no mention of discipline, re-training or any other consequence for the personnel responsible for searching, screening, monitoring and supervising of Ms. Palmer.  Based upon my training education and experience it is important to hold staff accountable for actions which violate facility policy and procedures; especially those which jeopardizes the safety of an inmate.  This lack of accountability was also evident in the fact that the City of Sullivan (MO) and Chief Counts failed to conduct and document an immediate comprehensive internal administrative review of the actions of staff in the death of Karen Palmer.  The Missouri State Highway Patrol did conduct a law enforcement investigation into the death to determine if any laws were violated. As an experienced jail administrator I feel it is also vitally important to conduct an immediate thorough administrative review of all applicable policies, procedures, logs, videos, staff and inmate interviews and reports after a critical incident such as the death of an inmate.  A comprehensive administrative review of all critical incidents is vital to ensure the operation of a safe and efficient corrections facility. The City of Sullivan (MO) and Chief Counts must not only determine if staff followed policy and procedures, but also if the policies need to be reviewed and

updated. A thorough administrative review can also highlight areas of a training deficiency and point out problems with equipment or the physical plant of the facility. Most importantly, an effective and comprehensive administrative review confirms for the jail staff that they will be held responsible for their actions and it creates a "culture of accountability" for all levels of command. In this case, a lack of accountability through all levels of command seems to have created a "culture of indifference" to the most basic responsibilities for a Jail. The failure of the City of Sullivan (MO) and Chief Counts to conduct and document a comprehensive administrative review of the death of pre-trial detainee Karen Palmer is in violation of contemporary corrections industry standards and practices, specifically Performance Standard **7D (Facility Administration)** of the **Performance-Based Standards for Adult Local Detention Facilities** (4th Edition; June 2004) promulgated by the American Correctional Association (ACA), which states:

> **ACA Standard 7D:** "The facility is administered efficiently and responsibly."

13.   It is well known in the jail industry that special care must be taken with the housing, monitoring and supervision of newly admitted inmates, especially those who have a history and/or charge concerning drug abuse. The risk and needs of each newly admitted inmate must be assessed and addressed individually, based on objective and identifiable criteria, which provides for placement of the inmate in the least restrictive housing, compatible with his or her assessed risk and needs. Once the inmate's risk level and needs are identified the proper level of monitoring can be applied. Newly arrested prisoners that have a history of drug abuse is a very common

occurrence in today's jails. The safe handling, housing, monitoring and supervision of this type of prisoner are basic responsibilities of the administration and staff of every jail.   Based upon my training, education and experience an effective initial classification and risk assessment system improves the safety, security and control of inmates by identifying and providing appropriate surveillance for each group and by assisting the corrections staff in knowing what "kind" of inmates are where; it also assists in the deployment of personnel. The initial screening process should be a valid risk assessment screening so inmates can be housed in the least-restrictive manner possible. The process should use verifiable and documented data about inmates.

14.    Based upon my training, education and experience it is a well established standard of care in the jail industry that special care must be given to prisoners during their first 24-72 hours of incarceration. This is the period of time that newly admitted prisoners are most likely to harm themselves. It is especially important to maintain in-person visual checks on prisoners with a known history of drug abuse.  This type of inmate may also suffer from the symptoms of withdrawal and/or delirium tremens which are potentially fatal medical conditions. The practice and custom at the Sullivan Police Department Jail was to monitor prisoners by use of a stationary video camera mounted on a wall across from each cell. When asked in deposition about the need for in-person surveillance of prisoners former Assistant Chief Vernon Zelch admitted he knew it was a more effective method of supervision but they chose not to use it; the Department's Accreditation Officer Patrick Johnson stated the staff did not have time to do it; and Det. Roche stated it was too expensive.  Based upon my training, education and experience an inmate's right to be protected from harm is not

subject to being restricted for security, staffing or financial concerns.  The risk to the safety of pre-trial detainee Karen Palmer was obvious.

Following initial intake a prisoner must be periodically checked by in-person contact.  It is shocking to the conscious that after the initial placement of Ms. Palmer in Cell #4, no staff performed an in-person surveillance check until the medication pass at 0040 hours on 10/17/09. Another seven (7) hours and fifteen (15) minutes passed until the next medication pass and visual in-person check at 0755 hours, and then four (4) hours and twenty (20) minutes went by until Officer Darrin Jones entered the cell area at 1215 hours for the purpose of feeding Ms. Palmer.

15.     The Sullivan Police Department has no policy for in-person checks on prisoners. The video evidence and deposition testimony of officers and dispatchers clearly shows that jail staff made no attempt to monitor or assess Ms. Palmer in-person while she was in Holding Cell #4. The jail facility relies totally on video cameras placed in front of the cell for supervising and assessing each prisoner. Based upon my training, education and experience this custom and practice ignores the most important and basic element of prisoner safety; **in-person observations by an adequately trained staff person**. It is a clearly established standard in the jail industry that the in-person supervision and interaction with each inmate provides jail staff with important and vital information about each inmate and allows staff to detect changes in the prisoner's appearance, behavior and environment. These changes can only be observed and heard (and even smelled) if the jail staff make in-person observations on a routine but irregular schedule. These "changes" give staff critical information about how to safely manage each inmate. In the case of Karen Palmer there is

17

evidence that she was self-mutilating by cutting on her arm. It would be impossible for a stationary video camera to pick up the changes in her behavior as effectively as the in-person observations of jail staff.  As an example; a simple drop of blood on the floor of the cell, the frame of the bed, a sheet or a shirt sleeve could be easily seen by a trained staff person and immediate action taken to ensure the safety of the inmate. Missouri State Highway Patrol Investigator Mertens' report states "a closer examination of the items in the cell revealed a plastic fork located on the desk that appears to have been bent at the neck of the prongs to create a rigid mechanism". Based upon my training education and experience such a cutting instrument would have been much more likely to have been discovered if in-person checks had been performed on Karen Palmer. Sullivan Police Department policy requires that all such utensils are inventoried and removed after the meal is completed but deposition testimony indicates that it was never done at the time of Karen Palmer's death. Both Kevin Halbert and Vernon Zelch concede that the Sullivan Police Department video monitors are inadequate to detect detail.  Based upon my training, education and experience video surveillance of inmate living areas is only a supplement **not a substitute** for in-person surveillance of prisoners; especially, newly admitted pre-trial prisoners with a history of drug abuse such as Ms. Karen Palmer. The inefficiency of video surveillance as a substitute for in-person checks is demonstrated by the outrageous fact Karen Palmer hung in her cell for two hours before being discovered.

16.    Another disturbing fact in the Sullivan Police Department Jail is that the communications officers are tasked with the supervision of the prisoners but receive no training of how to adequately perform those duties. The communication staff are

asked to make observations from the video monitors and are not even aware of what to look for, as evidenced by Communication Supervisor Kevin Halbert's deposition testimony that he did not even consider a string from a "hoodie" sweatshirt to be a ligature and would not alert an officer to remove it. It is not uncommon in small police agencies to have the communications staff and/or "dispatchers" help with the supervision of prisoners. However, it is also clearly established in the jail industry that they must be trained, and supplemented by other staff that do in-person checks. Based upon my experience this involves a patrol officer visiting the jail on a 30 and/or 60 minute schedule to perform in-person checks on each prisoner. The Missouri Police Chiefs Charitable Foundation, one of the agencies which provide accreditation and certification standards in Missouri for law enforcement agencies that operate detention facilities, clearly states in their standards that the agency have written directives that defines policy and procedures for the following security issues:

> **35.3 Security (e):** Face to face observation of unattended detainees at least every thirty minutes.

> **35.8 Detainee Supervision (a)** 24 hour on-site supervision by agency personnel as well as a face to face visual observation and custody count once per shift.

> **(b)** Visual observation at least every thirty minutes.

17.   In the case of the Sullivan Police Department Jail, deposition testimony seems to indicate that in-person surveillance started to happen on a few shifts after the death of Ms. Palmer. Unfortunately, there was no official policy, procedure or general order that required this minimal level of action to protect prisoners from harm at the time of

Karen Palmer's death and apparently up to present time. Based upon my training, education and experience the policy and practice of not providing in-person surveillance on a routine but irregularly scheduled basis created an obvious safety risk for pre-trial detainee Karen Palmer in violation of the Performance-Based Standards for Adult Local Detention Facilities (4th Edition; June 2004) and the Standards for Small Jails (January 1989) promulgated by the American Correctional Association. (ACA) Specifically, ACA **1A (Protection from injury and illness), 2A (Protection from Harm), 4-ALDF-2A-05, SJ-084, and SJ-085** which require:

> **ACA Standard 1A:** "Staff, volunteers, contractors, and inmates are protected from injury and illness in the workplace."
>
> **ACA Standard 2A:** "The community, staff, volunteers, contractors, and inmates are protected from harm. The number and severity of events are minimized."
>
> **4-ALDF-2A-05:** "Personal contact and interaction between staff and inmates are required and are facilitated."
>
> **SJ-084:** "Staff are provided for full coverage of designated security posts, full surveillance of inmates, and to perform all ancillary functions."
>
> **SJ-085:** "Written policy and procedure require that all high and medium security inmates are personally observed by a correctional officer at least every thirty minutes, but on an irregular schedule. More frequent observation is required for those inmates who are mentally disordered or who demonstrate unusual or bizarre behavior. Suicidal inmates are under continuous observation."

18.     The City of Sullivan (MO) and Police Chief George Counts, by not ensuring that in-person surveillance rounds are made on all prisoners and that his staff are trained in suicide recognition and prevention ignored a basic level of safety and protection for all inmates in the Sullivan Police Department Jail. The policy, practice and custom of the Sullivan Police Department Jail to rely solely on the observations of small video monitors by dispatchers (untrained in prisoner supervision and suicide recognition/prevention), who are routinely distracted with multiple other duties, creates an obvious safety risk for all prisoners in their jail. In reality, the City of Sullivan (MO) and Police Chief George Counts have actually created the safety risks and then ignored them and their responsibility to protect their prisoners from harm, including pre-trial detainee Karen Palmer. Knowledge of a risk to a prisoner's safety can be inferred by the very fact it was "obvious". Officials cannot ignore or refuse to acknowledge or verify prisoner conditions by "refusing to get involved". It was the duty of staff to act when sufficient visual evidence was reasonably available to alert them to potential issues concerning the safety of pre-trial detainee Karen Palmer if she was not monitored more often than every 4-7 hours. She was a newly admitted inmate and known drug abuser who had made the statement "I'm scared and I don't want to go back to prison." Based upon my training, education and experience the lack of adequate policies, procedures and training by the City of Sullivan (MO) and Police Chief George Counts directly contributed to the suicide of pre-trial detainee Karen Palmer.

19.     After my initial review, I render the following preliminary opinions within a reasonable degree of professional certainty, incorporating by reference the opinions

expressed in paragraphs 1-18. I reserve the right to update and modify my opinions if additional information or materials become available.

A. Opinions on Negligence Issues:

1. The City of Sullivan (MO), Police Chief George Counts, Darrin Jones, Shaun Hinson, Jeff Rohrer, Don Reed, Kevin Halbert and David Roche negligently failed to take reasonable steps to protect Karen Palmer when they knew or could have known she was at risk of self harm.

2. The City of Sullivan (MO), Police Chief George Counts, Darrin Jones, Shaun Hinson, Jeff Rohrer, Don Reed, Kevin Halbert and David Roche negligently failed to adequately screen, search, monitor and supervise Karen Palmer when they knew or could have known she was at risk of self harm.

3. Jeff Rohrer, Don Reed and Shaun Hinson negligently failed to remove the sweatshirt string from Karen Palmer's person and cell and were negligent by ignoring the policy and procedure that required them to do so, when they knew or could have known the string could be used for hanging.

4. Kevin Halbert negligently failed to adequately monitor Karen Palmer and/or ignored policy and procedure when he knew or could have known she was at risk of self harm.

5. The City of Sullivan and Police Chief Counts negligently failed to implement adequate policies and procedures to direct staff as to how to

22

screen, search, monitor and supervise prisoners, including Karen Palmer.

6. The City of Sullivan and Police Chief Counts negligently failed to adequately train its employees as to how to screen, search, monitor and supervise prisoners, including Karen Palmer.

7. The City of Sullivan and Police Chief Counts negligently created and allowed a custom and practice of inadequate screening, searching, monitoring and supervising of prisoners, including Karen Palmer.

8. The City of Sullivan and Police Chief Counts negligently failed to provide adequate holding facility staff to monitor and supervise prisoners, including Karen Palmer.

9. The City of Sullivan and Police Chief Counts negligently employed a video monitoring system as a substitute for in-person cell check which they knew or could have known was insufficient to monitor the personal and safety needs of prisoners, including the personal and safety needs of Karen Palmer.

10. The City of Sullivan and Police Chief Counts negligently created a safety risk for Karen Palmer in that they negligently failed to require in-person cell checks, failed to train jail personnel in inmate safety, and allowed a custom and practice which led to Karen Palmer being placed in a cell with a ligature.

11. The negligence of the City of Sullivan (MO), Police Chief George Counts, Darrin Jones, Shaun Hinson, Jeff Rohrer, Don Reed, Kevin

Halbert and David Roche as outlined in paragraphs 1-10 directly
contributed to cause the hanging and resulting death of Karen Palmer.

B.  Opinions on Deliberate Indifference issues:

As discussed, having deprived Karen Palmer of her liberty and placing her an
isolated cell the City of Sullivan (MO), Police Chief George Counts, Darrin
Jones, Shaun Hinson, Jeff Rohrer, Don Reed and Kevin Halbert owed Karen
Palmer a duty to adequately protect her from self harm and provide adequate
medical/mental health assessment and treatment. Karen Palmer, as a new pre-trial
detainee and known drug user, was at obvious increased risk for self harm.

1.  The City of Sullivan and Police Chief Counts were deliberately indifferent
to the safety needs of Karen Palmer when they knew the following;

a.  Pre-trial detainees are at risk for suicide, especially those with
drug abuse histories.

b.  A necessary means for prevention of suicide is removal of
ligatures such as belts and strings.

c.  Because of a pre-trial detainees' risk of suicide, detainees must be
adequately monitored.

d.  There was no system in place for in-person cell checks.

e.  Prisoners are often placed in isolation.

f.  Dispatchers responsible for monitoring inmates were not trained
in suicide prevention.

g.  Sullivan Police Department Policies and Procedures for suicide
recognition and prevention were inadequate.

Despite that knowledge, the City of Sullivan and Police Chief George

Counts:

    a.  Did not promulgate and/or implement adequate policies and procedures to direct staff as to how to screen, search, monitor and supervise prisoners, including Karen Palmer.

    b.  Did not ensure adequate training to direct staff as to how to screen search, monitor and supervise prisoners, including Karen Palmer.

    c.  Created and allowed a custom and practice of inadequate screening, searching, monitoring and supervising of prisoners, including Karen Palmer

    d.  Did not provide adequate holding facility staff to monitor and supervise prisoners, including Karen Palmer.

    e.  Employed a video monitoring system as a substitute for in-person cell checks, which they knew was an insufficient substitute for in-person cell checks, to monitor prisoners' personal and safety needs, including Karen Palmer.

    f.  Created an obvious safety risk for Karen Palmer, a newly admitted prisoner and known drug user, by not requiring in-person cell checks, not training jail personnel in inmate safety and allowing the custom and practice which led to Karen Palmer being placed in her cell with a ligature.

25

2. Jeff Rohrer, Shaun Hinson and Don Reed  were deliberately indifferent to the safety needs of Karen Palmer when they consciously violated an established policy and did not remove the sweatshirt string from Karen Palmer, a newly admitted prisoner and known drug user.

3. Darrin Jones was deliberately indifferent to the safety  needs of Karen Palmer when he consciously violated an established policy by not removing a plastic fork from her cell and did not assess her risk of self harm knowing her circumstances of isolation.

4. Supervisor of the Communication Division Kevin Halbert was deliberately indifferent to the safety needs of Karen Palmer in that he accepted the responsibility to monitor Karen Palmer when he knew:

   a. He was the sole person charged with the responsibility of monitoring her to protect her from self harm;

   b. The purpose of the 10 minute monitoring policy was to prevent suicide or attempted suicide;

   c. The 10 minute monitoring policy was impossible to comply with given his other duties;

   d. The video equipment did not show detail.

5. The deliberate indifference of the City of Sullivan (MO), Police Chief George Counts, Darrin Jones, Shaun Hinson, Jeff Rohrer, Don Reed and

Kevin Halbert as outlined in paragraphs 1-4 directly contributed to cause the hanging and resulting death of Karen Palmer.

20.     In summary, the duty of City of Sullivan (MO), Police Chief George Counts, Darrin Jones, Shaun Hinson, Jeff Rohrer, Don Reed, Kevin Halbert and David Roche was to take reasonable steps to protect pre-trial detainee Karen Palmer from harm while she was in their custody.   They failed and the facts in this case indicate a practice and custom of inadequate policies, procedures and training on clearly established jail standards which are designed to protect all prisoners from harm.

21.     Should you wish further information or clarification on issues discussed in this report, don't hesitate to contact me.   I reserve to right to update and modify my opinions after further review and if additional information or materials become available during discovery.

Signed this 13th day of April, 2012 in Cincinnati, Ohio.

Jeff Eisen

Attachments (2):

Exhibit #1 - Resume/CV
Exhibit #2 - List of Publications, fee schedule and list of all cases retained as an
            expert witness in the last four years.

27