# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

DEBORA D. TANNER, et al.,                    )
                                             )
   Plaintiffs,                )
                                             )
  v.                               )          Case No. 4:11-CV-1361 NAB
                                             )
CITY OF SULLIVAN, et al.,                    )
                                             )
   Defendants.                )

## MEMORANDUM AND ORDER

The matter before this Court[1] is a Motion for Summary Judgment filed by Defendants City of Sullivan, Chief George Counts, Darrin Jones, Jeff Rohrer, Don Reed, Kevin Halbert and Shaun Hinson.  [Doc. #84].

## I. PROCEDURAL BACKGROUND

Debora Tanner, Danny Palmer and C.B. by and through next friend Debora Tanner (collectively, "Plaintiffs") brought this action individually, and on behalf of Karen Palmer, deceased. [2]  In their Second Amended Complaint, Plaintiffs allege that Defendants violated Karen Palmer's constitutional rights during her confinement at the Sullivan Police Department Jail.  Plaintiffs also bring Missouri state law wrongful death causes of action against the City of Sullivan as well as Defendants Counts, Reed, Jones, Halbert, Rohrer, Hinson and David Roche[3] in their individual and official capacities.

---

[1] All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

[2] Debora Tanner and Danny Palmer are the biological parents of Karen Palmer, C.B. is a minor and the biological daughter of Karen Palmer.

[3] David Roche died while this matter was pending.  This Court granted Plaintiffs' motion to substitute Doyla Roche on the individual capacity claims.  George Counts was substituted for David Roche on the official capacity claims.

## II.    FACTUAL BACKGROUND[4]

Karen Palmer was arrested by Sullivan Police Officer Jeff Rohrer on October 16, 2009 on an outstanding warrant.  However, Rohrer was also investigating Palmer for felony stealing.  She was alleged to have stolen a bottle of a generic version of Percocet. After her arrest, Rohrer took Palmer to the City of Sullivan Police Department, where he began the booking process.  He also informed her of her Miranda rights and along with Detective David Roche, he interrogated Palmer for stealing the pills.  Roche testified that when he met with Palmer she was not cuffed. After he explained the charges, Palmer became upset and was on the verge of tears.  He testified that Palmer explained that she doesn't need to get into this kind of trouble, she had a new prospect on a job, and loves her baby girl.  Palmer never expressed a desire to commit suicide. Roche testified that he did not believe that Palmer was going to harm herself.

During the interrogation, Palmer completed a written statement confessing to stealing the bottle of pills.  In the statement she also stated that felt like a horrible person and that she was scared and did not want to go back to prison.  Rohrer testified that Palmer was upset at the time of the interview, but she did not appear to be under the influence of drugs or alcohol. Rohrer admitted that while he knew Palmer had stolen pills, he did not ask her if she had taken any of the medication.

Rohrer did not finish booking Palmer.  Instead, after the interrogation, Rohrer and Officer Don Reed escorted Palmer back to her house to get the stolen pill bottle. When the officers brought Palmer back to the house, her boyfriend Andrew Baker and his mother Donna Baker were at the house.  Donna Baker testified that while Karen never said she was suicidal, it was obvious to her that Karen was in danger.  Baker said she told the officers that Karen was not in

---

[4] The Court's recitation of the facts is taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to Plaintiffs' case

her right frame of mind and should not be left alone. She also told officers to be sure Palmer took her medication. Palmer was wearing a hooded sweatshirt with a string in the hood at the time of her arrest.

After the pill bottle was recovered and a search of the home was completed, officers took Palmer back to the jail.  Rohrer and Reed then continued the booking process.  The officers filled out a portion of the booking report regarding Palmer's personal property.  Rohrer testified that he patted Palmer down, but he did not remove the string from her hooded sweatshirt because he did not see one. Reed did not search Palmer because Rohrer had done so.  Reed testified that he was trained to determine if an inmate had a ligature on them.  Reed says he did not see a string in Palmer's hood, but Kayla Shuler, Andrew Baker's sister, testified the strings were on the hood of the sweatshirt Palmer was wearing.

As part of the booking process, Reed filled out the computerized booking form and Palmer's Inmate Medical Record with answers that Palmer provided.  He stated that Palmer did not report any injuries.  Reed was aware that Palmer's medications included Gabapentin and Venlafaxine, however he was not sure what those medications were prescribed for. He was aware that the medication Effexor is an antidepressant.  Rohrer testified that he was aware that Palmer was on prescription medication, but he did not know that she was bipolar.

As part of the booking process, Officer Shaun Hinson took Palmer's fingerprints and allowed her to make a telephone call.  He testified that when he first encountered Palmer she was upset and crying.  He says she continued to cry during the phone call, where he overheard her asking her mother to post bond for her.  Hinson placed Palmer into a cell, but did not search her. Hinson acknowledged that there was an inventory of property policy that stated "all personal property, including jewelry, belts, shoelaces, etc. shall be taken from the prisoner and entered on

the inmate's booking report."   Hinson stated that the purpose of that procedure was "to make sure that they're safe inside the cell and remove all items that we—to account for them so that they're able to be returned back to them whenever they leave our facility."   He stated that because he thought Officer Reed had searched Palmer and removed her personal property, he did not remove any personal property from Palmer.   Hinson did not see a string on Palmer's hooded sweatshirt.

Deputy Matthew Hines worked the midnight shift on October 16th.   He provided medication to Palmer at 12:40 a.m. on October 17th.   Later that morning, Deputy Darrin Jones fed Palmer breakfast and at around 7:50 a.m., he gave her access to her medicine.   Jones testified that Palmer did not do anything out of the ordinary when he spoke with her.   Jones testified that he was trained to screen for suicidal inmates by evaluating their actions that consisted of if the inmate says something or shows behavior then they take them over to the hospital.   When he went to Palmer's cell to deliver her lunch, Jones found Palmer dead.   He testified that she had a pink string around her neck, she was leaning against the cell and her feet were on the ground.   He called for assistance and Officer Reed responded.   Reed cut the string and lowered Palmer to the ground.   She was pronounced dead by paramedics at the scene.

In October 2009, the Sullivan Jail relied on a closed circuit TV system to watch inmates in their cells.   There was a policy in place that required the communications officer to conduct surveillance of the inmates in ten-minute intervals.   They relied on the video surveillance because they did not have a regular jailer on duty.   On October 17th,  Kevin Halbert was the communications officer on duty.   He was familiar with the policy that required that surveillance monitors should be checked every 10 minutes.   He was responsible for monitoring Palmer.

Halbert stated that he did not see Palmer tie the string to the cell and hang herself because he was busy with other duties.

## III.     SUMMARY JUDGMENT STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only of all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Fed.R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (*quoting* Fed. R. Civ. P. 1).  "By its very terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish "the non-existence of any genuine issue of fact that is material to a judgment in

his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).  Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue.  *Anderson*, 477 U.S. at 256-57.  When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293F.3d 456, 465 (8th Cir. 2002).  To meet its burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it.  *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334.  "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000).  The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

## IV.    PLAINTIFFS' CLAIMS UNDER FEDERAL LAW: 42 U.S.C. § 1983

In Count I of their Second Amended Complaint, plaintiffs seek to recover under 42 U.S.C. § 1983 for the violation of Palmer's constitutional rights.  Plaintiffs allege that the defendants were deliberately indifferent to the known and/or obvious risk of suicide and

Palmer's serious medical needs.  Plaintiffs allege that the City of Sullivan is liable for failure to train officers and dispatchers in suicide prevention.  They also allege the individual officers and dispatchers failed to adequately implement in-take procedures.  Defendants claim that summary judgment is appropriate because they are entitled to qualified immunity from suit.

**A.**      **Deliberate indifference to a known risk of suicide**

Qualified immunity protects government officials from suit under 42 U.S.C. § 1983 when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Nance v. Sammis*, 586 F.3d 604, 608-09 (8th Cir. 2009).  To overcome qualified immunity, the plaintiff must "assert a violation of a constitutional or statutory right; that right must have been clearly established at the time of the violation; and given the facts most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right."  *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000).

In this case, the plaintiffs have asserted a constitutional violation.  The Eighth Amendment prohibits officials from acting with deliberate indifference towards an inmate's substantial suicide risk.  *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003).  The Supreme Court has held that under the due process clause of the Fourteenth Amendment, a pretrial detainee holds at least the same level of constitutional protection that is enjoyed by prisoners under the Eighth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  To prevail on the claim of deliberate indifference, Plaintiffs must show: (1) Defendants knew Palmer presented a substantial suicide risk; and (2) Defendants failed to respond reasonably to that risk. *Coleman,* 349 F.3d at 538 (citing *Olson v. Bloomberg,* 339 F.3d 730, 735 (8th Cir. 2003)).

### 1.  Liability of Defendant Jailers

Plaintiffs claim the Defendant Jailers were deliberately indifferent to the known risk of suicide because they failed to:

> Adequately implement in-take procedure, adequately identify and/or remove dangerous items from decedent's person and/or cell, adequately identify and/or monitor decedent's prescription medication, adequately identify and/or monitor decedent's depression condition and obvious risk of harm to herself, and adequately monitor decedent and decedent's cell.

Pls' Second Am. Compl. ¶ 10.

To prevail on a deliberate indifference claim, Plaintiffs must first show actual knowledge. *Coleman*, 349 F.3d at 538.  "It is not enough to show the risk was obvious.  A prison official is not liable under the Fourteenth Amendment unless the official knows of facts evidencing a substantial suicide risk *and* the official actually infers the prisoner presents a substantial suicide risk."  *Id.* (emphasis in original).  However, a plaintiff can prove knowledge through circumstantial evidence.  *Id.*

Second, once an official knows of a risk, the Eighth Amendment requires the official take reasonable measures to abate the risk.  *Id.*  "When determining the adequacy of an official's response to a known risk of inmate safety, 'deliberate indifference includes something more that negligence but less than actual intent to harm;' it requires proof of a reckless disregard of a known risk."  *Id.* at 538-539 (quoting *Riley v. Olk-Long*, 282 F.2d 592, 597 (8th Cir. 2002)).

Plaintiffs' Second Amended Complaint states that Palmer was in obvious need of serious medical care in that she suffered from a known depression condition and/ or was an obvious substantial risk of harm to herself.  Defendant Jailers deny having knowledge that there was a

risk Palmer would commit suicide.  While defendants cannot be charged with inferences that they did not actually draw, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Farmer,* 511 U.S. 825, 842 (1994).

Therefore, this Court must determine whether the risk that Palmer would commit suicide was obvious.  Plaintiffs claim the jailers had notice because Donna Baker told officers Palmer was not in her right frame of mind, that she was on medication and should not be left alone.  In addition, officers testified that Palmer was upset because she was arrested, that she was crying and that she expressed that she was scared and did not want to go back to prison.  Plaintiffs also argue that Palmer had a large abrasion on her wrist after she was discovered dead in her cell and that the Highway Patrol Investigator concluded that she had used a fork to cut her wrist for forty minutes before she hung herself.  Plaintiffs contend that because Halbert was monitoring Palmer's cell during the time period before, during, and after her suicide, there is a disputed issue of material fact as to whether Halbert had actual notice of Palmer's suicide risk.

Defendant Jailers contend no one told them that Palmer was suicidal.  Defendants Rohrer and Reed acknowledge that Palmer was upset during the interview, but that her demeanor improved after she was told that if she cooperated with law enforcement the charges might be dropped.  In addition, Palmer never expressed any suicidal tendencies.  All of the jailers testified that Palmer's actions appeared to be normal.  While there are disputed issues of fact regarding whether Halbert was adequately watching the video monitors when Palmer hung herself, this does not establish that Halbert had actual knowledge that Palmer posed a risk of suicide.

Viewing the facts in the light most favorable to the Plaintiffs, as the non-moving party, and giving Plaintiffs the benefit of all reasonable inferences which may be drawn from the facts, the Court finds that the risk that Palmer would commit suicide was not obvious.  Defendant

Jailers, therefore did not know that Palmer presented a substantial suicide risk.  Since Plaintiffs have failed to establish that the jailers had actual knowledge of Palmer's suicide risk, they cannot establish that the jailers were deliberately indifferent to a known risk of suicide.  Accordingly, the Defendant Jailers are entitled to qualified immunity on the § 1983 claim.

### 2.  Liability of City of Sullivan

Plaintiffs claim the City of Sullivan and the Chief of the Sullivan Police Department, George Counts were deliberately indifferent to the known risk of suicide because: (a) they failed to train officers and dispatchers in suicide prevention, monitoring of prisoners, identification of at risk prisoners, detection of dangerous items on detainees and in cells, and intake; (b) they failed to enforce policies and procedures, discipline officers, and allowing a custom and practice of continued and persistent deviations from policies and procedures; (c) they maintained inadequate suicide prevention policies and procedures and an inadequate monitoring system; and (d) failed to adequately staff the jail facility.  Pls.' Second Am. Compl. ¶ 9.

It is well established that for municipalities, *respondeat superior* or vicarious liability will not attach under § 1983.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy… inflicts the injury that the government as an entity is responsible under § 1983."  *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694 (1978).  A municipality may be liable for failure to train its employees when that failure can be shown to be deliberate indifference to the rights of others.  *Yellow Horse v. Pennington County*, 225 F.3d 923, 928 (8th Cir. 2000).

Deliberate indifference in the context of a claim for failure to train is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of

his action.  *Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397,  410 (1997).  When city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.  *Id.* at 407.  The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution."  *Canton,* 489 U.S. at 395.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.  *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011).

A supervisor may be held individually liable under § 1983 if a failure to properly supervise and train the offending employees caused a deprivation of constitutional rights.  Plaintiffs must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts, which requires a showing that the training procedures and supervision were inadequate and likely to result in a constitutional violation. *See Wever v. Lincoln County Nebraska*, 388 F.3d 601, 606 (8th Cir. 2004).

In *Wever*, a man was arrested after he made a 911 call.  Officers were concerned that he was suicidal because he was depressed and crying during the call.  Prior to his arrest, the man threatened to kill himself if jailed.  Not long after he was arrested and placed in a cell, he requested a blanket.  After receiving the blanket from the jailers, he hung himself.  The district court was affirmed for denying summary judgment to the Sheriff on plaintiff's claim for individual liability against the Sheriff, "in large part because he 'did not present any evidence showing what training procedures, if any, were in place for handling potentially suicidal detainees or inmates, nor did he present any evidence showing what steps, if any were taken

following' an earlier suicide that had occurred during his term as sheriff."  *Id.* at 605.  The Sheriff was aware of two prior suicides in the Lincoln County jail, one while he was sheriff and one before his term began.  The Eighth Circuit recognized that a supervisor may be individually liable under § 1983 if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.  *See also Vaughn,* 438 F.3d at 851 (failure to properly supervise and train the offending employee may cause a deprivation of a constitutional right).

The 8th Circuit recognized plaintiff's burden of demonstrating that the supervisor was deliberately indifferent to or tacitly authorized the offending acts.  "This requires a showing that the training procedures and supervision were inadequate and likely to result in a constitutional violation."  The Court noted that although the Sheriff did not contest supervisory liability in his motion for summary judgment, he did address it in his reply brief. In a qualified immunity analysis, the Court ruled, "[i]n some instances, one or two suicides may be sufficient to put a sheriff on notice that his suicide prevention training needs revision. . .Wever has alleged that Carmen [sheriff] was placed on notice by two previous suicides, and we cannot say this is insufficient as a matter of law."  *Id.* at 608.

### a.  Failure to train

It is undisputed that the City of Sullivan did not have a program in place to train officers to determine who might be at risk for suicide.  However, defendants did provide evidence that the jailers were trained on proper intake procedures, monitoring prisoners and detection of dangerous items on detainees or in their cells.

With regard to  the adequacy of training in suicide prevention, the undisputed evidence is that Defendant Rohrer received field training at Sullivan Police Department and he was trained to identify suicidal behavior and to call an ambulance.  Reed testified that he went through the

Sullivan Police Department field training program.  He stated he received training at Sullivan Police Department to screen for suicide.  He testified that the training consisted of:  If someone showed signs or behavior that might show they wanted to harm themselves or stated they wanted to harm themselves, he had the discretion to determine if that person was suicidal.  Defendant Jones testified that suicide screening consisted of taking a detainee to the hospital if they come into the jail and say they want to harm themselves.  Defendant Halbert testified that if people threaten to harm themselves, or if he observed them attempt to harm themselves, they would get immediate attention.  Chief Counts testified that the Sullivan Police Department does not have someone qualified to make the determination of whether an inmate has a mental illness or is at risk for suicide.  He stated that the policy regarding suicide is "if you have someone that's trying to commit suicide, you take them to the hospital."  A person would be considered at risk of suicide if they spoke about committing suicide or they want to commit suicide.  There is no evidence that Defendants Roche or Hinson had any training for suicide prevention or screening for suicidal detainees.

Plaintiffs also contend that officers were not properly trained on intake procedures. However, the officers who booked Palmer, Defendants Rohrer, Reed, and Hinson all testified that they had read the Sullivan PD policy and procedure manual and that they were trained on intake procedures, including removing ligatures from detainees before placing them in a cell.

Plaintiffs argue that this Court should draw the inference that Defendant Halbert's training was inadequate with regards to monitoring prisoners to prevent suicide.  Halbert testified that he helped write the PD's communications policy.  That policy provides that "the dispatcher will watch so that a prisoner does not tie something to the cage or around his neck attempting to strangle themselves."  The policy also required that all items that may be used to create a ligature

13

shall be taken from prisoners.  Plaintiffs note that Halbert testified that he did not know that a drawstring from a hooded sweatshirt was a ligature at the time of Palmer's suicide.  While Halbert may not have been aware that a drawstring could be used as a ligature, that fact is not material in this case because there is no evidence that Halbert was responsible for searching Palmer.  In addition, there is no evidence that he saw the drawstring in her sweatshirt before her suicide.

As Defendants concede, the Police Department policy and approach in place at the time of Palmer's death may have been inadequate.  However, that is not the end of the inquiry.  The question for the Court is whether Chief Counts had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.

It is undisputed that there had been at least 12 suicide attempts during the years preceding Palmer's death.  However, no one had actually committed suicide in the Sullivan jail.  Therefore, the Sullivan Police Department policy and procedure of taking detainees to the hospital if they indicate they are suicidal or attempt to harm themselves does not amount to deliberate indifference.  There is no indication from the record that Chief Counts had notice that the policies, training procedures or supervision were inadequate and likely to result in a constitutional violation.  This case is distinguishable from *Wever*.  In that case, the 8th Circuit held the defendant sheriff was put on notice his training procedures and supervision were inadequate given the sheriff knew of two prior suicides in his jail, one of which occurred during his tenure as sheriff.  *Id.* at 607-08.

### b.    Failure to Enforce Department Policies and Procedures

Plaintiffs also claim the City of Sullivan was deliberately indifferent to Palmer's rights in that they failed to enforce policies and procedures for suicide prevention including policies and

procedures for prisoner in-take, confiscation of dangerous items from prisoners and monitoring of prisoners; failed to enforce the policies through discipline; and caused, permitted and allowed a custom and practice of continued deviations from police department policies and procedures. This failure to enforce claim can be analyzed as a failure to supervise.  A claim for failure to supervise requires the same analysis of a claim of failure to train.  *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998).  "First a supervisor cannot be held vicariously liable under § 1983 for an employee's actions.  Second…a failure to supervise may be maintained only if a defendant demonstrated deliberate indifference or tacit authorization of the offensive acts."  *Id.*  As with the failure to train claim, this claim is governed by the deliberate indifference standard.  *Id.*

The City and Chief Counts may be liable under § 1983 if they (1) had "notice of a pattern of unconstitutional acts committed by subordinates;" (2) were deliberately indifferent to or tacitly authorized those acts; and (3) failed to take "sufficient remedial action;" (4) proximately causing Palmer's death."  *Livers v. Schenck,* 700 F.3d 340,355 (8th Cir. 2012) (internal quotation marks and citations omitted).  To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to the liability.  *Id.* at 356.

Plaintiffs argue that there is a reasonable inference that it was the custom and practice of the SPD to allow officers to escape discipline for violations of policies and procedures.  In support of this argument, Plaintiffs note that Chief Counts testified that no disciplinary action would be taken against an officer who violated a procedure or rule, if that officer was able to articulate a reason that was acceptable to him or a supervisor.  As an example, Plaintiffs point to Chief Counts' failure to discipline officers Rohrer and Hinson for violating department policy that mandated removal of ligatures, when they failed to remove the string from Palmer's sweatshirt before putting her in a cell.

15

To succeed on this claim, Plaintiffs must show there was a pattern of Chief Counts allowing unconstitutional acts to be committed by his subordinates; that he tacitly authorized those acts; that he failed to take remedial action and the acts cause Palmer's death.  However, Plaintiffs have not presented undisputed facts establishing that Chief Counts' practice of allowing officers to articulate a reason for failing to follow a policy or procedure allowed unconstitutional acts to be committed by those officers.  Chief Counts' decision not to discipline Officers Rohrer and Hinson following Palmer's death does not establish deliberate indifference.

### c.   Inadequate suicide prevention policies and procedures and inadequate monitoring system

In their Memorandum in Opposition to Defendants' Motion for Summary Judgment, Plaintiffs claim that the City of Sullivan maintained unconstitutional policies, customs and procedures.  Plaintiffs argue that the intake/screening policy which states that the Sullivan Police Department is not equipped to house inmates who require immediate or sustained medical attention, fails to require that an inmate be screened for suicide.  Defendants' corrections expert testified that there should be screening for anyone who is placed in jail, including questions about their physical and mental health.

Plaintiffs  also contend that the monitoring policies exposed inmates to a safety risk.  The monitoring policies require that a communications officer check on prisoners every 10 minutes by looking at a video monitor, but there is no policy, custom or practice for doing cell checks. Again, the Plaintiffs provide testimony from the Defendants' expert who testified that 30 minute cell checks should be required.

While Plaintiffs have presented evidence that the policies and procedures may be inadequate, they fail to establish that these policies are facially unconstitutional.  In addition,

Plaintiffs fail to cite to any authority to support their argument that an expert's opinion regarding the adequacy of policies and procedure constitutes a constitutional violation.

Employing a failure to train analysis, Plaintiffs' argument fails.  In order to defeat summary judgment on this issue, the Plaintiffs must show that the City disregarded a known or obvious consequence of its action.  *See Bryan supra.*  When city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.  *Id.* at 407.  Plaintiffs have not demonstrated that the City had actual or constructive notice that any inadequacy in its policies regarding intake procedures or monitoring of inmates caused a violation of citizens' constitutional rights.  Therefore, Plaintiffs have not established that the City was deliberately indifferent in choosing to retain the challenged policies.

### d. Inadequate staffing

Plaintiffs also argue that there are disputed issues of fact regarding whether the Sullivan Police Department was adequately staffed.  Even if there was inadequate staffing, the City did not have actual or constructive notice that any inadequacy in staffing caused a violation of constitutional rights.  Accordingly, Plaintiffs have not demonstrated that the City acted with deliberate indifference with regard to the staffing.

Viewing the facts in the light most favorable to the Plaintiffs, as the non-moving party, and giving Plaintiffs the benefit of all reasonable inferences which may be drawn from the facts, the Court finds that there are no genuine issues of material fact to establish that the City of Sullivan and Chief Counts were deliberately indifferent to a known risk of suicide through a failure to train or supervise the Defendant Jailers.  Nor have Plaintiffs established that inadequate

policies and procedures rose to the level of constitutional violations. Accordingly, summary judgment will be entered in favor of the City and Chief Counts on the § 1983 claim.

## V.    Count II- Wrongful Death Mo. Rev. Stat. § 537.080

Plaintiffs also bring a wrongful death cause of action under Missouri law against Defendants Don L. Reed, Darrin M. Jones, Kevin L. Halbert, Jeff Rohrer, Shaun Hinson, David Roche, George Counts ("Defendant Jailers") and the City of Sullivan.  Second Am. Compl. pp. 8-12.  Defendants assert that they are entitled to summary judgment on the wrongful death claim because (1) Plaintiffs failed to establish the proximate cause of Palmer's suicide, (2) Defendants have official immunity from liability, (3) Defendants are not liable under the public duty doctrine, and (4) the City of Sullivan has sovereign immunity from suit.  Plaintiffs contest Defendants' assertions.

### A.    Defendant Jailers

The Defendant Jailers assert that they are immune from liability in Plaintiffs' wrongful death claim under the official immunity and public duty doctrines.  Further, the Defendant Jailers assert that even if they were not entitled to immunity, Plaintiff cannot establish that their actions were the proximate cause of Palmer's death.

#### 1.    Official Immunity[5]

Under Missouri law, "public officials exercising discretionary duties, as opposed to ministerial duties, are entitled to official immunity from suit for all discretionary acts unless the officials acted in bad faith or with malice, which ordinarily requires actual intent to cause injury."  *Austell v. Sprenger*, 690 F.3d 929, 938 (8th Cir. 2012) (internal quotations omitted).

---

[5] The Court notes that Defendants' Motion for Summary Judgment only addresses official immunity for Defendants Reed, Jones, Halbert, Rohrer, Hinson, and Roche regarding the search of Palmer; Defendant Halbert regarding his video monitoring of Palmer; and Defendant Jones regarding leaving utensils in Palmer's cell.  The Defendants did not address any other allegations against the Jailer Defendants in relation to the official immunity defense. Therefore, these are the only allegations addressed by the Court in its analysis.

"Whether an act can be characterized as discretionary depends on the degree of reason and judgment required."  *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008).

> A discretionary act requires the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued.  A ministerial function, in contrast, is one of a clerical nature which a public officer is required to perform upon a given set of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed.

*Id.*  "The determination of whether an act is discretionary or ministerial is made on a case-by-case basis, considering: (1) the nature of the public employee's duties; (2) the extent to which the act involves policy making or exercise of professional judgment; and (3) the consequences of not applying official immunity.  *Id.*

### a.      Search of Palmer

In this case, the City of Sullivan had written procedures that stated that "[a]ll personal property (jewelry, belts, shoe laces, etc.) shall be taken from the prisoner and entered on the inmates, "Jail/Booking Report- SPD-64-A."  [Doc. 119-7].  The City's procedures also state "[a] thorough and systematic search shall be made of the prisoner."  *Id.*  Finally, the procedures state that "[i]tems that may be used to create a ligature shall be taken from all prisoner's [sic] (shoe laces, etc.)"  *Id.*

"The mere act of inventorying and securing an arrestee's property in a prescribed manner during booking, is not a protected discretionary function in light of the lack of policy making or expertise involved."  *Jungerman v. City of Rayton*, 925 S.W.2d 202, 206 (Mo. 1996), *abrogated on other grounds by Southers*, 263 S.W.3d at 615, n. 13.  The facts of the case clearly show a ministerial function.  The City's procedures detail the procedure for booking detainees, including

the inventory of property,  removal of ligatures, and a thorough and systematic search of inmates.

Defendant Jailers argue that "to the extent that a detainee's property is hidden, the decision to

conduct a more thorough search for such items is the epitome of discretion as it necessarily relies

upon the defendant's judgment and experience with inmates, such as Palmer."   The Court

disagrees.  The City's procedures require a "thorough and systematic" search of all inmates and

the removal of items that may be considered a ligature.  It is undisputed that Palmer entered the

jail with a hooded sweatshirt that contained a string, which is common in hooded sweatshirts.

The purpose of conducting a search of detainees is to find unauthorized items that the detainees

are not allowed to possess and may be hidden on their bodies or clothing.[6]  It is a huge logical

stretch to conclude that a "thorough and systematic search" including the requirement to remove

ligatures would not require an officer as part of his ministerial duties to look for a string in an

item of clothing known to commonly contain strings.  Therefore, "the police officers enforcing

the search procedure were not exercising judgment and discretion and they are not entitled to the

protection offered by official immunity."

### b.        Video Monitoring of Palmer

Defendant Halbert contends that he is entitled to official immunity regarding Plaintiffs'

claims that he failed to monitor Palmer by video camera.  The City's Communication Officer

Training Manual policy regarding video monitoring states as follows:

> It is a tremendous responsibility for communications to
> ensure the safety of the Prisoners incarcerated in the
> Sullivan Jail.  Each one MUST be monitored.  There is no
> sound from this system.  You will watch so that a prisoner
> does not tie something to the cage or around his neck
> attempting to strangle themselves.

---

[6] "Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies.  Facility personnel, other inmates, and the new detainee himself or herself may be in danger if these threats are introduced in the jail population."  *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S.Ct. 1510, 1513 (2012).

[Doc. 120-1] (emphasis in original).  The City's General Orders states "[t]he monitor's [sic] located in the main console, shall be surveilled by the duty C/O in 10 minute interval's [sic], unless circumstances dictated a closer watch, (i.e., suicide threat, escape risk, etc.) and "the Communications Division shall visually monitor prisoner's [sic] behavior while they are in custody"  [Doc. 119-7].  Halbert contends that it is undisputed that he checked the monitors every 10 minutes and he had no information that Palmer was a suicide risk.  Moreover, he states that he did not recognize that she was hanging from the cell, because it appeared to him that she was just sitting on the stool with her back to the camera.

The court disagrees.  First, the act of monitoring the video monitor every ten minutes and watching to ensure that a prisoner did not tie something to the cage were ministerial acts.  Halbert had no discretion in performing those actions.  Second, there is a genuine issue of disputed fact regarding whether Halbert checked on Palmer every ten minutes.  The string from the sweatshirt used by Palmer to hang herself is clearly visible on the video tape and it is also clear that Palmer was not sitting on the stool, because the empty stool was clearly visible to Palmer's immediate left.  Halbert acknowledges that he was doing other duties at the time of Palmer's suicide.  Furthermore, Palmer's body was left hanging for two hours before being discovered, despite Halbert allegedly viewing her twelve times during a two hour time period.  Because of these disputed facts, official immunity is not appropriate in this case.  *See Hutson v. Walker*, 688 F.3d 477, 486 (8th Cir. 2012) (official immunity appropriate if no genuine issue of material fact remains).  Therefore, the Court denies official immunity regarding Halbert's actions in monitoring Palmer via the video monitor.

### c.      Utensil in Palmer's Cell

Next, Defendant Jones contends that he is entitled to official immunity regarding leaving the plastic eating utensils in Palmer's cell.  Plaintiffs allege that Palmer "self-mutilated" her wrist for forty minutes with the plastic fork that was left in her cell prior to hanging herself.  Plaintiffs rely upon the City's General Order, which states: "[a]ny tools, culinary items or similar items brought into the cell block shall be recorded in and out through the 'officer in charge' of the holding facilities."  [Doc. 119-7].  Plaintiffs state that the failure to remove the fork for four hours violated the policy regarding utensils.  The Court finds that the determination of when to remove utensils from a prisoner's cell is discretionary and Defendant Jones is entitled to official immunity regarding the failure to remove the plastic fork from Palmer's cell.  Although the officers were required to record the delivery and pick-up of utensils, there is no mandated policy regarding the length of time a utensil could stay in a prisoner's cell.  Further, although Reed testified that leaving a fork in a cell for four hours would deviate from the policy, he also testified that there were acceptable reasons to deviate from the policy.  Because the determination of when the utensils are to removed is a discretionary act and there is no evidence of any bad faith or malice on the part of Jones, official immunity must be applied in this instance.

### 2.      Public Duty Doctrine

Next Defendant Jailers contend that the public duty doctrine provides them immunity from suit.[7]  "The public duty doctrine states that a public employee is not civilly liable for the

---

[7] It is unclear from Defendants' Memorandum in Support of Motion for Summary Judgment the specific actions they assert are shielded by the public duty doctrine.  Plaintiffs' Second Amended Complaint makes several and sometimes different allegations against each Defendant.  Defendants give a broad statement asserting they are seeking immunity regarding "Defendants actions with respect to Palmer during the normal course and scope of their employment on 10/16 and 10/17."  In their Reply Memorandum, Defendants specifically reference the failure to remove ligatures from Palmer.  Therefore, the Court will only address immunity under the public duty doctrine based on the failure to remove Palmer's hooded sweatshirt string.

breach of a duty owed to the general public, rather than a particular individual." *Southers*, 263 S.W.3d at 611. "This public duty rule is based on the absence of a duty to the particular individual, as contrasted to the duty owed to the general public." *Id.*

> The public duty doctrine does not insulate an employee from all liability, as he could still be found liable for breach of ministerial duties in which an injured party had a special, direct, and distinctive interest. This exception exists when injury to a particular identifiable individual is reasonably foreseeable as a result of a public employee's breach of duty. Whether an individual has such a private interest depends on the facts of each case, not on broad pronouncements about the usual status of relevant functions. Further, the protections of the public duty doctrine are not intended to be limitless, and just as the doctrine of official immunity will not apply to conduct that is willfully wrong or done with malice or corruption, the public duty doctrine will not apply where defendant public employees act in bad faith or with malice.

*Id.* at 611-12 (citing *Jungerman*, 925 S.W.2d at 205). "The public duty doctrine is not an affirmative defense, but rather delineates the legal duty the defendant public employee owes the plaintiff." *Id.* at 612. "The applicability of the public duty doctrine negates the duty element required to prove negligence, such there can be no cause of action for injuries sustained as the result of an alleged breach of public duty to the community as a whole." *Southers*, 263 S.W.3d at 612.

In this case, the Defendant Jailers assert that they are entitled to immunity under the public duty doctrine as they did not owe a particular duty to Palmer, because she never exhibited an obvious risk of suicide, none of the Defendants saw the string in her sweatshirt, and the risk that she would commit suicide was not reasonably foreseeable. Missouri courts have found that the practice of removing personal belongings has several plausible policy rationales including preventing the prisoner from harming himself and others and keeping a close account of the

prisoner's property. *Cooper v. Planthold*, 857 S.W.2d 477, 480 (Mo. Ct. App. 1993) (policy to remove all personal property was not promulgated to protect particular individuals and no special duty to remove suspenders from prisoner who later hung himself). Plaintiffs assert that Defendants owed a special duty to Palmer to remove dangerous items from her person, because there was a substantial risk that Palmer would harm herself, which was reasonably foreseeable as a result of the Defendants' policy violations.

The Court will deny immunity under the public duty doctrine in this case. Plaintiffs have introduced sufficient evidence that a reasonable jury might find that the risk of suicide by Palmer was reasonably foreseeable as a result of the Defendants' failure to follow the policies regarding thorough and systematic searches and the removal of ligatures considering Palmer's demeanor at the time of arrest and admonitions to watch her and provide her with her medicine.

### 3. Causation

"Missouri's causation standard in a wrongful death case is that the decedent's death was a 'direct result' of a defendant's negligence." *Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299, 309 (Mo. 2011). "Before a jury can decide causation, a plaintiff must offer evidence that the court determines would establish that the defendant's negligence was the proximate cause of the decedent's death." *Id.* "If this evidence is not offered or is insufficient, the plaintiff has not made a submissible case." *Id.* Proximate cause is a question for the court. *Id.* "A plaintiff can show that the defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the decedent's suicide was the natural and probable consequence of the injury he suffered at the hands of the defendant." *Id.* "Unless this evidence-which may require expert witness testimony-is presented, the suicide would be an intervening cause and the claim would not be submitted to the jury." *Id.* at 309-310. "If,

however, the plaintiff presents evidence that the suicide resulted from the injury, the claim then can be submitted to the jury to decide as a question of fact, whether the suicide is a direct result of the defendant's negligence.  *Id.* at 310.

The Court finds that Plaintiffs have met the standard for submitting its wrongful death claim in Count II to the jury.  In a previous order on this date, the Court denied in part Defendants' Motion to Exclude and Strike Proffered Testimony of Plaintiffs' Proposed Expert, Jeffrey Eiser.  In accordance with that Order, the Court finds that Dr. Eiser's testimony will assist the jury in determining whether Palmer's death was a direct result caused by the injury that she allegedly suffered due to Defendants' negligence.  Dr. Eiser's testimony is admissible on the issue of causation, which is genuine issue of material fact that will be determined by a jury.  *See Kivland*,  331 S.W.3d at 313-314.

### B.    City of Sullivan

The City of Sullivan asserts that it is immune from suit pursuant to the sovereign immunity doctrine.   Plaintiffs assert that the City is not entitled to sovereign immunity protection, because the video monitoring system was a "dangerous condition," which destroys its sovereign immunity protection.  "Sovereign immunity from tort liability exists except when such immunity is specifically waived, and this lawsuit does not fall within any such waivers." *Coleman v. City of Pagedale*, 4:06-CV-1376 ERW, 2008 WL 161897 at *9 (E.D. Mo. Jan. 15, 2008).  The parties do not dispute that the City of Sullivan is a public entity as defined by Mo. Rev. Stat. § 537.600.

A public entity waives immunity under § 537.600 if the injury complained of arises from the negligent operation of a motor vehicle or a dangerous condition of property.  *State ex rel. Board of Trustees of City of North Kansas Memorial Hosp. v. Russell*, 843 S.W.2d 353, 358

(Mo. 1992).   To benefit from the statutory waiver [regarding dangerous conditions] set out in § 537.600.1(2), [Plaintiffs are] required to prove four elements: (1) that the property was in dangerous condition at the time of the injury, (2) that the injury directly resulted from the dangerous condition- that is, that the dangerous condition was the proximate cause of the injury, (3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury that was incurred; and (4) that a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.  *Hensley v. Jackson County*, 227 S.W.3d 491, 496 (Mo. 2007) (internal citations omitted); Mo. Rev. Stat. § 537.600.1(2).  Based on the facts in the light most favorable to the Plaintiffs, the Court finds that Plaintiffs cannot prove a dangerous condition of property.  As an initial matter, Plaintiffs have not shown that the video monitoring system was a dangerous condition.  The video monitoring system was operating that day, because it recorded Palmer for hours, including when she committed suicide.  In their Statement of Facts, Plaintiffs repeatedly state that Halbert failed to observe Palmer using the video monitoring system.  (Pls.' S. Facts ¶¶ 55, 79, 88).  Failure to observe the video monitor does not make the system defective or a dangerous condition.  Therefore, the dangerous condition exception to sovereign immunity does not apply in this case.

Finally, a public entity can waive sovereign immunity to the extent of coverage received for liability insurance.  Mo. Rev. Stat. § 537.610.1  "[W]here the insurance policy includes a disclaimer concerning the waiver of sovereign immunity, it has not been waived under § 537.610.1."  *Conway v. St. Louis County*, 254 S.W.3d 159, 167 (Mo. Ct. App. 2008).  Although the City of Sullivan has purchased an insurance policy, it has not waived sovereign immunity.  The City submitted its policy provisions, which specifically state that "[t]his

insurance does not include coverage for any liability or suit for damages which is barred by the doctrines of sovereign immunity or governmental immunity, as set forth in Chapter 537.600 R.S.M.O. et seq."  Missouri courts frequently uphold similar non-waiver provisions in public entity insurance contracts.  *See e.g., Russell*, 843 S.W.2d at 360 (sovereign immunity provision does not constitute a waiver of immunity under § 537.610); *Conway*, 254 S.W.3d. at 167 (same).  Therefore, the City of Sullivan has not waived its sovereign immunity and is entitled to summary judgment regarding Count II of Plaintiffs' Second Amended Complaint.

**VI.   Conclusion**

For the foregoing reasons, the Court will grant summary judgment in favor of all Defendants regarding Count I of Plaintiffs' Second Amended Complaint based on qualified immunity.  The Court will grant summary judgment in favor of the City of Sullivan regarding Count II of Plaintiffs' Second Amended Complaint based on sovereign immunity.  The Court will grant summary judgment in favor of Defendant Darrin M. Jones regarding Count II related to the failure to remove plastic utensils from Palmer's cell based on official immunity.  The Court will deny summary judgment regarding Count II as to Defendants Don Reed, Darrin Jones, Kevin Halbert, Jeff Rohrer, Shaun Hinson, and David Roche regarding the failure to remove the drawstring from Palmer's hooded sweatshirt.  The Court will deny summary judgment regarding Count II as to Defendant Kevin Halbert's failure to monitor Palmer via the jail's video monitoring system.  The Court will deny Defendants' motion for summary judgment regarding causation in Count II.  Therefore, this case will proceed to trial on the claims outlined above as well as the claims not addressed in Defendants' motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.  [Doc. 84].

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in favor of all Defendants on Count I of Plaintiffs' Second Amended Complaint.

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in favor of Defendant Darrin M. Jones regarding Count II of Plaintiff's Second Amended Complaint related to the failure to remove plastic utensils from Palmer's cell.

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in favor of the City of Sullivan regarding Count II of Plaintiff's Second Amended Complaint.

**IT IS FURTHER ORDERED** that summary judgment is **DENIED** regarding all other matters presented in Defendants' motion for summary judgment.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave of Court for Permission to Supplement the Record on Summary Judgment in Light of Newly Discovered Evidence Pursuant to Rule 60(b) is **DENIED as untimely**.  [Doc. 168]

A separate Judgment will accompany this Memorandum and Order.

Dated this 9th day of January 2013.

/s/ Nannette Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE