**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBORA D. TANNER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-CV-1361 NAB |
| | ) | |
| CITY OF SULLIVAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER[1]**

This matter is before the Court on Defendants Kevin L. Halbert, Shaun Hinson, Darrin

M. Jones, Don L. Reed, and Jeff Rohrer's Rule 50 Motion for Judgment as a Matter of Law or in

the Alternative Rule 59 Motion for Remittitur or New Trial. [Doc. 213].

**I.       Procedural Background**

Debora Tanner, Danny Palmer and C.B. by and through next friend Debora Tanner

(collectively, "Plaintiffs") brought this action individually, and on behalf of Karen Palmer,

deceased.[2]   In their Second Amended Complaint, Plaintiffs alleged that Defendants violated

Karen Palmer's constitutional rights during her confinement at the Sullivan Police Department

Jail in Count I.  Plaintiffs also brought Missouri state law wrongful death causes of action against

the City of Sullivan as well as Defendants George Counts, Don Reed, Darrin Jones, Kevin

Halbert, Jeff Rohrer, Shaun Hinson, and David Roche[3] in their individual and official capacities

---

[1] All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).
[2] Debora Tanner and Danny Palmer are the biological parents of Karen Palmer, C.B. is a minor and the biological daughter of Karen Palmer.
[3] David Roche died while this matter was pending.  This Court granted Plaintiffs' motion to substitute Doyla Roche on the individual capacity claims.  George Counts was substituted for David Roche on the official capacity claims.

in Count II. On January 9, 2013, the Court granted in part and denied in part Defendants' Motion for Summary Judgment. [Doc. 172]. The Court granted judgment in favor of all Defendants on Plaintiff's constitutional rights claim in Count I under 42 U.S.C. § 1983; in favor of Defendant Jones regarding failure to remove plastic utensils from Palmer's cell regarding Count II; and in favor of Defendant City of Sullivan regarding Count II. The Court then granted Plaintiffs' Motion to Dismiss Defendant David Roche without prejudice. [Doc. 190].

A jury trial was held on the remaining wrongful death claims. At trial, the Court entered a directed verdict in favor of defendant Counts on all claims and Defendant Jones regarding aggravating circumstances damages. The jury returned a verdict in favor of Plaintiffs on the remaining counts on January 18, 2013. [Doc. 199]. The jury awarded Plaintiffs $1,300,000.00 in actual damages; $250,000.00 in aggravating circumstances damages against Defendant Jeff Rohrer; $150,000.00 in aggravating circumstances damages against Defendant Don Reed; $150,000.00 in aggravating circumstances damages against Defendant Shaun Hinson; and $1,000,000.00 in aggravating circumstances damages against Defendant Kevin Halbert. Defendants then filed a Rule 50 Motion for Judgment as a Matter of Law or in the Alternative Rule 59 Motion for Remittitur or New Trial. [Doc. 216].

## II.    Factual Background

The testimony at trial most favorable to the jury's verdict is as follows:

On the morning of October 16, 2009, Jeff Rohrer of the Sullivan Police Department was dispatched to the residence of Christina Smith, because of a report of a prescription pill theft. Upon his arrival, Smith reported to Rohrer that a female named "Karen" came to her house that morning to pay off a debt. Smith stated that during the visit from Karen, Smith went to the bathroom and when she returned Karen was gone as well as Smith's medication. Smith alleged

that Karen was the only other person in the residence that morning. Smith gave Rohrer Karen's boyfriend's name, the area where he lived, and a description of his vehicle. Rohrer went to the area indicated by Smith and located the aforementioned vehicle and the license plate was registered to the person named by Smith as Karen's boyfriend.

Rohrer went to the residence indicated on the registration. The residence was owned by Donna Baker, Karen's boyfriend's mother. Rohrer spoke with Karen Palmer and told her about the accusations against her. He asked her to meet him at the police department later to discuss it with him. Palmer agreed to go to the police station. Rohrer then returned to Smith's home to pick up Smith's written statement. After receiving the statement, Rohrer called dispatch to run a check on Palmer's name and was told that she had an outstanding warrant in the City of Sullivan for failure to appear in court. Rohrer then returned to Palmer's home, informed her of the active warrant, and placed her under arrest. At the time of her arrest, Palmer was wearing a pink hooded sweatshirt.

Rohrer began the process of booking Palmer. Rohrer testified that he checked Palmer's pockets and performed a full custodial search of her, including the pockets of the sweatshirt. Rohrer testified that he does not remember checking the hood of Palmer's sweatshirt and he did not see a string hanging down from the hood of her sweatshirt. Rohrer and David Roche, also of the Sullivan Police Department, then interrogated Palmer regarding the missing drugs. During the interrogation, Palmer was crying and admitted that she took the prescription drugs from Smith's residence. Palmer also wrote a statement confessing to stealing the pills. In the statement, she indicated that she was scared. Rohrer took a booking photograph of Palmer. Don Reed, of the Sullivan Police Department, retrieved a ring from Palmer.

After the interrogation ended, Rohrer and Reed took Palmer from the police station to her home to retrieve the prescription drugs. On the way to her home, the officers stopped at an area where Palmer had stated she had thrown the bottle that contained the drugs she had taken from Smith. At her home, Palmer gave the officers a wallet containing the stolen drugs-generic Percocet. Palmer also retrieved her own prescription medication. Donna Baker, who was at home, told the police officers that they should watch Karen very carefully, because she was very concerned about Palmer's state of mind and very concerned about her being depressed.

After a return to the station, Reed continued the process of booking Palmer. He questioned Palmer about her medical condition and treatment. Palmer informed Reed that she had asthma, had previously been treated for drug addiction, and was taking the prescription medications Effexor, Seroquel and Celexa. Reed testified that he did not search Palmer and did not recall whether Palmer's sweatshirt had a hood or a string.

Shaun Hinson, of the Sullivan Police Department, completed the booking process. Hinson testified that Rohrer asked him to give Palmer a phone call and to fingerprint her. He stated that Palmer called her mother and asked her mother to bond her out of jail. According to Hinson, Palmer's mother would not post bond and Palmer cried for a few minutes. Hinson then placed Palmer into a cell, but did not search her.

The jail monitored Palmer's cell through a video monitoring system. The video monitoring system allowed a person monitoring the cells to see views of one, four, six, eight, ten, or twelve images at once on a 17 inch screen. The images can be enlarged, however, as the image is enlarged it becomes blurry. A smaller image gives a clearer picture.

On October 17th, Darrin Jones, of the Sullivan Police Department, testified that he brought Palmer breakfast at around 7:50 a.m. and gave her medicine. Jones did not remember

what Palmer was wearing, nor did he notice that she had a string in the hood of her sweatshirt. At approximately 10:16 a.m., Palmer took the string out of the hood on her sweatshirt and hung herself from the cell door. Palmer died shortly thereafter. Palmer's body hung for two hours. At the time that Palmer committed suicide, Chief Communications Officer Kevin Halbert was responsible for monitoring the detainee's cells via the video monitoring system. Halbert did not see Palmer commit suicide and stated that he thought she was sitting on the stool motionless. Halbert testified he was busy with other duties, but that he looked at the monitor of Palmer's cell every 10 minutes. He did not think that it was unusual that Palmer would sit on a stool motionless for two hours. Halbert testified there is nothing that can be done to prevent someone from committing suicide.

Sometime around noon Jones returned to the cell to bring Palmer lunch. He yelled into Palmer's cell to ask if she was "decent," as he did with all female detainees. When Jones walked into Palmer's cell, he saw her body hanging against the cell door. He shook her arm and observed that she was already dead and then immediately called for assistance. Reed responded to his call for assistance and cut Palmer's body down and they both lowered Palmer's body to the ground. Halbert then called for an ambulance. None of the defendants received discipline regarding Palmer's suicide.

III.    Standard of Review

Federal Rule of Civil Procedure 50(b) states that when deciding a renewed judgment as a matter of law (JMOL) motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law. A pre-verdict JMOL motion at the close of all evidence is a prerequisite to filing a renewed JMOL motion under Rule 50(b). *Naturopathic Laboratories Intern., Inc. v. Dermal Research*

*Laboratories, Inc.*, 415 F. Supp. 1007, 1010 (W. D. Mo. 2006). In the matter of a renewed JMOL, a court "must affirm the jury's verdict 'unless, in viewing the evidence in the light most favorable to the prevailing party, [the court] concludes that a reasonable jury could not have found for that party.'" *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (quoting *EEOC v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003)). Additionally, the court considers all evidence in the record without weighing credibility, and makes reasonable inferences and resolves conflicts in favor of the non-moving party. *Schooley v. Orkin Extermination, Co., Inc.*, 502 F.3d 759, 764 (8th Cir. 2007). A JMOL is proper only if the evidence viewed according to these standards would not permit reasonable jurors to differ in the conclusions that could be drawn. *Employers Mut. Cas. Co. v. Collins & Aikman Floorcoverings, Inc.*, 422 F.3d 776, 779 (8th Cir. 2005).

## IV.     Discussion

### A.     PUBLIC DUTY DOCTRINE

Defendants Rohrer, Reed, Jones, Hinson and Halbert argue that they are shielded from personal liability by the public duty doctrine. Defendants maintain that the policies requiring the removal of ligatures were multi-directed, and therefore the duty of care was owed to the general public rather than to Karen Palmer. The plaintiffs contend that Defendants are not entitled to protection of the public duty doctrine because the injury to Palmer was reasonably foreseeable.

The Missouri Supreme Court first recognized the public duty doctrine in *Parker v. Sherman*, 456 S.W.2d 577 (Mo. 1970). A taxpayer appealed the dismissal of his action for damages against a sheriff for an alleged breach of duties to prevent gambling at a county fair. *Id.* The Court held that even if the county sheriff knew or could have found out that the gaming

statute was being violated by persons conducting games of chance at the county fair and the sheriff could have found people under twenty-one participating in such games, plaintiff who had substantial investments in the county would not be entitled to recover from the sheriff for actual and punitive damages on basis that the sheriff had not prohibited operation of games or arrested those operating them, thereby immeasurably harming the moral tone of the community. *Id.* Affirming the dismissal, the Court stated, "It is an undisputed principle of the common law, that for a breach of a public duty, an officer is punishable by indictment; but where he acts ministerially, and is bound to render certain services to individuals, for a compensation in fees or salary, he is liable for acts of misfeasance or non-feasance to the party who is injured by them." *Id.* at 579-80. The Court added that, "the keeping of the peace is a duty a sheriff owes to the general public but a breach thereof is not actionable by a citizen who has shown no particular individual right violated by such failure." *Id.* at 580.

The doctrine was next applied in *Sherill v. Wilson,* 653 S.W.2d 66 (Mo.1983). In *Sherill*, the plaintiff's son was killed by a man who had been involuntarily committed to a state mental institution. *Id.* The plaintiff alleged that the defendants, including the superintendent and director of the mental institution as well as the chief of the medical staff and a doctor were grossly negligent in releasing the patient on a two day pass. *Id.* at 662. The question was whether the physicians who were treating a mentally ill patient owed a duty to the general public in deciding which patients should be released on pass, giving rise to a civil action by a member of the general public for negligent exercise of judgment. *Id.* at 664. The Court held that the treating physicians did not owe duties to the public generally which would support tort liability for negligence. *Id.* It stated that, while there are numerous situations in which a public officer may

be held liable for breach of a duty owed to an individual, this decision deals only with tort liability arising out of duties owed to the public at large. *Id.*

The doctrine was also applied in *Cooper v. Planthold.* In that case, a police booking officer was sued after the plaintiff's son died in a jail cell after hanging himself by his suspenders. 857 S.W.2d 477 (Mo.App. 1993). The Missouri Court of Appeals upheld the grant of summary judgment in favor of the defendant. *Cooper*, 857 S.W.2d at 480. The court mentions the public duty doctrine, and then analyzes the special duty exception to the public duty doctrine, stating "appellant has failed to demonstrate that a special duty was owed to the deceased and not to others." *Id.* at 479-80. It goes on to say that the practice of removing personal belongings has several plausible policy rationales. *Id.* at 480. Because the court found that the policy was multi-directed, it was meant to protect all in custody, not simply the particular prisoner. *Id.* It also stated that the "maintenance of safe jail cells is a duty the police department owes to the public at large and not to a particular individual." *Id.* The court also noted that there was no evidence the order was promulgated to personally protect particular individuals. *Id.*

In *Jungerman v. Raytown*, the Missouri Supreme Court stated that under the public duty doctrine, a public employee is not civilly liable –even for a breach of a ministerial duty—if that duty is owed to the general public rather than to a particular individual. 925 S.W.2d 202, 205 (Mo.banc 1996). In *Jungerman*, the plaintiff appealed from a judgment notwithstanding the verdict negating a jury's finding that the City of Raytown negligently lost his watch. *Id.* at 204. Jungerman had been arrested, and the arresting officer took his personal property, including a gold Rolex watch when he was booked. *Id.* The City claimed that the public duty doctrine shielded it from liability. *Id.*

In its analysis of the application of the public duty doctrine, the Court found that under the facts of the case, the act of inventorying and securing an arrestee's property was a ministerial act. *Id.* at 206. It noted that the department's training manual, general ordinances and regulations detail the procedures for booking arrestees, including the inventory and protection of property. *Id.* Next, the Court determined "whether the duty was owed to the general public or whether it was a special, direct and distinct duty owed to Jungerman individually." *Id.* The Court found that the primary purpose of the inventory policy is to account for an arrestee's property in order that all lawful property not kept as evidence is returned upon release. *Id.* After examining the particular policies at issue, the Court found, "Jungerman unquestionably had a special, direct, and distinct interest in the proper handling of his personal property by the Raytown police department. Clearly, injury to him as a distinct, identifiable individual was foreseeable from a breach of the duty to inventory and secure his watch." *Id.*

The Missouri Supreme Court extensively discussed the public duty doctrine in *Southers v. City of Farmington,* 263 S.W.3d 603 (Mo.banc 2008). It stated that the public duty doctrine is not an affirmative defense, but rather delineates the legal duty the defendant public employee owes the plaintiff. *Id.* at 612. The applicability of the public duty doctrine negates the duty element required to prove negligence, such that there can be no cause of action for injuries sustained as the result of an alleged breach of public duty to the community as a whole. *Id.* Distinguishing the public duty doctrine from the doctrine of official immunity, the Court stated "Application of the public duty doctrine leaves the plaintiff unable to prove all the elements of his claim for negligence, whereas application of the doctrine of official immunity merely impacts liability but does not destroy the underlying tort. *Id.*

The issue before this court is whether Karen Palmer's death resulted from a breach of duty owed to her specifically by the defendant officers or whether her death resulted from a breach of duty owed to the public at large. In other words, whether the injury to Palmer as a distinct, identifiable individual was foreseeable from a breach of duty to search her and remove the ligature from her sweatshirt.

The court must examine the Sullivan Police Department policies in place at the time of Palmer's death and determine the primary purpose of the policies. *See Jungerman*, 925 S.W. 2d at 206 (while inventorying property may serve public purposes, it's primary purpose is to account for arrestee's property in order that all lawful property is returned upon release). The relevant policies in place at the Sullivan PD involved the inventory of prisoner's property and prevention of death, suicide or homicide.

The Inventory of Property policy provided: "All personal property (jewelry, belts, shoe laces, etc.) shall be taken from the prisoner and entered on the inmates' Jail/Booking Report-SPD-64A. Property shall be placed in a Prisoner's Personal Property Bin that corresponds with the inmates cell location." The Death, Suicide and Homicide policy provided in part: "…Items that may be used to create a ligature shall be taken from all prisoner's (shoe laces, etc.)"

The defendant officers testified that they understood both of the policies and they admitted they violated the policies because the string from Palmer's hooded sweatshirt was not found. Defendant Rohrer also admitted that he failed to conduct a search of the sweatshirt's hood. The officers testified that the policies were in place for Palmer's protection as well as for the safety of the officers.

Defendants argue that the Sullivan Police Department's Inventory of Property policy is similar to the policy in Cooper. They contend that the policy has a multi-directional purpose

designed to prevent inmates from entering the jail with items that could be used to harm themselves, other inmates and police officers. Therefore, the policy is meant to protect the public rather than Palmer as an individual. The Court agrees. The Inventory of Property policy serves several plausible purposes, among them, to inventory and safeguard inmates' property as well as to insure the safety of inmates and officers.

Defendants also claim they are shielded from personal liability under the public duty doctrine because the Death, Suicide and Homicide policy is designed to benefit inmates and police officers. Therefore, they argue, it is also multi-directed. The Death, Suicide and Homicide policy states that items that may be used to create a ligature shall be taken from all prisoners. In their Brief, Defendants claim that Halbert testified that this policy applied only to dispatchers who are monitoring inmates, however, at trial there was no such testimony. In addition, Rohrer, Reed, Hinson and Halbert testified that they were aware of the Death, Suicide and Homicide policy and its purpose.

The evidence at trial established that suicide is a concern at the Sullivan jail. There was testimony that there had been several attempted suicides over the years at the jail. The defendant officers all testified that they understood that one of the reasons for the ligature removal policy is the prevention of suicides. In addition, the inmates were housed in an area of the jail where they are monitored by a camera rather than being regularly visited by officers. The testimony and evidence in this case establishes that the primary purpose of the Death, Suicide and Homicide policy is to remove ligatures to prevent suicides. This purpose was recognized in the SPD's Communications Officer Training Manual which states: "You will watch so that a prisoner does not tie something to the cage or around his neck attempting to strangle themselves."

Furthermore, the injury to Palmer was foreseeable, because the evidence in the light most favorable to the verdict establishes that Palmer was upset and crying during the questioning after she was arrested. In addition, Donna Baker expressed concern about Palmer's state of mind, telling the arresting officers that Palmer should be carefully watched. Despite having that information, the officers left Palmer alone for hours. Palmer therefore had a special, direct and distinct interest in having the string of her hooded sweatshirt removed. Injury to her as a distinct, identifiable individual was foreseeable from a breach of the duty to properly search her and remove the ligature. Defendants, therefore are not shielded from personal liability by the public duty doctrine.

### B.     CAUSATION

Defendants maintain that Plaintiffs failed to present evidence that Defendants caused or directly contributed to cause Palmer's suicide. Defendants rely on *Kivland v. Columbia Orthopedic Group*, 331 S.W.3d 299, 302 (Mo banc. 2011) for the proposition that in order to prove causation there must be evidence that Palmer suffered an injury at the hands of the defendants and that there must be medical expert testimony to establish a causal connection between some injury attributable to Defendants that caused Palmer to kill herself.

In *Kivland*, the plaintiff committed suicide after being paralyzed during an operation. He suffered intense pain in the paralyzed region and efforts to alleviate the pain failed. *Id.* The plaintiff filed a medical malpractice suit against the surgeon and after filing suit, he committed suicide. His family amended his suit to include a wrongful death claim for the suicide. *Id.* The decedent's surgeon moved for partial summary judgment on the action's claims for wrongful death and lost chance of recovery, asserting that the decedent's suicide was an independent intervening act, and that, as a matter of law, the surgeon legally could not be responsible for the

decedent's death. *Id. at 303– 04.* As to the wrongful death claim, the Court rejected the surgeon's request to make a general exception to the causation standard when the death is by suicide, and instead held that plaintiffs can show that a defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the suicide was the "natural and probable consequence" of the injury the decedent suffered at the hands of the defendant. *Id.* at 309.

Defendants claim that *Kivland* requires testimony from a medically qualified expert to establish a medical or psychological explanation for why Palmer committed suicide. *Kivland,* however, does not set forth such a requirement. In *Kivland*, the Court stated that to show causation in a wrongful death case, a plaintiff must show that the negligence of the defendant directly caused, or directly contributed to cause the death. *Id.* at 306. The Court then rejected the argument that for a decedent to commit suicide in response to an irresistible impulse, the decedent must have been suffering from a diagnosed mental disorder or mental illness of some sort. *Id.* at 308.

Stating that the causation standard in Missouri in a wrongful death case is that the decedent's death was a "direct result" of a defendant's negligence, the Court opined that "the better rule is to focus on what Missouri cases actually required in wrongful death cases: whether the decedent's death was a direct result of defendant's negligence." *Id.* at 309. The Court added that proximate cause—which is a question for the court—is established by evidence that the injury or death suffered was the natural and probable consequence of defendant's conduct. *Id.* The Court also stated that this evidence *may require expert testimony* if no direct evidence is available. *Id.*

Contrary to Defendants' contentions, *Kivland* does not require medical expert testimony to establish proximate causation. During trial, Plaintiffs presented sufficient evidence from which a jury could believe that, had the string been removed from Palmer's hooded sweatshirt, Palmer's death would have been prevented. Likewise, the Plaintiffs presented sufficient evidence from which a jury could believe that if Palmer had been properly monitored, her death would have been prevented. Proximate cause, was therefore established in this case.

Defendants also claim that the testimony of Plaintiffs' expert Jeff Eiser was improper because he was not qualified to express an opinion explaining why Palmer committed suicide. Again, the defendants rely on the *Kivland* decision to suggest that a medical or psychological opinion was necessary to explain Palmer's mental status. As discussed *supra*, medical expert testimony was not necessary in order for Plaintiffs to establish proximate causation. *See Kivland*. Defendants' motion for judgment as a matter of law on the issue of causation is therefore, denied.

## C. AGGRAVATING CIRCUMSTANCES

Defendants seek judgment as a matter of law on the issue of aggravating circumstances damages. They argue that the evidence was not sufficient to warrant submission of aggravating circumstances damages to the jury. Defendants contend that because this court entered summary judgment against Plaintiffs on the claim under 42 U.S.C. § 1983, there is no evidence of Defendants' complete indifference to Palmer's safety.

Section 537.090 R.S.Mo provides that the jury may consider the following in a wrongful death action: "The mitigating or aggravating circumstances attending the death may be considered by the trier of the facts, but damages for grief and bereavement by reason of the death shall not be recoverable." In Missouri, aggravating circumstances damages are to be treated as

punitive damages. *Bennett v. Owens-Corning Fiberglas Corp.*, 896 S.W.2d 464 (Mo. banc 1995).

To support a claim for damages for aggravating circumstances, there must be clear and convincing evidence in support of the claim. *Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 110 (Mo. banc 1996). Specifically, evidence must show that the defendant either knew or had reason to know that there was a high degree of probability that the defendant's conduct would result in injury. *Hoover's Dairy,* 700 S.W.2d at 436. The defendant's conduct must be tantamount to intentional wrongdoing where the natural and probable consequence of the conduct is injury. *Id.* at 435. With such a showing, a plaintiff can recover for aggravating circumstances based upon the defendant's complete indifference to or conscious disregard for the safety of others. *Alack v. Vic Tanny Int'l,* 923 S.W.2d 330, 338–39 (Mo. banc 1996).

"'Conscious disregard or complete indifference' includes situations where the person doing the act or failing to act must be conscious from the knowledge of surrounding circumstances and existing conditions, that, although lacking specific intent to injure, the person's conduct or failure to act will naturally or probably result in injury." *Smith,* 275 S.W.3d at 813. Submission of aggravating circumstances is proper when the defendant could have reasonably been charged with knowledge of a potentially dangerous situation but failed to act to prevent or reduce the danger. *Blum v. Airport Terminal Services, Inc.*, 762 S.W.2d 67, 73 (Mo. App. 1988).

In the Memorandum and Order granting summary judgment to Defendants on the § 1983 claim, this court determined that there was no evidence of deliberate indifference to a known risk of suicide. As this court stated in the order, to prevail on a deliberate indifference claim, Plaintiffs must first show actual knowledge of a suicide risk and then once an official knows of a

risk, the official must take reasonable measures to abate the risk. In the record before the court at the summary judgment phase, this court found that Palmer's suicide risk was not obvious. Since plaintiffs failed to establish actual knowledge, this court found the defendants were entitled to qualified immunity on the § 1983 claims.

The standard for deliberate indifference differs from the standard for submitting a claim for aggravating circumstances damages in a wrongful death case. As stated above, submission of aggravating circumstances is proper when "a defendant could have reasonably been charged with knowledge of a potentially dangerous situation but failed to act to prevent or reduce the danger.

In this case, Defendants could have reasonably been charged with the knowledge that failing to search for, and remove a string in the hood of a sweatshirt is a potentially dangerous situation. The officers testified that they understood that one of the purposes of the policies requiring that inmates be searched and ligatures removed was to prevent suicides. Rohrer testified that he violated the police department policies when he failed to search for the string in the sweatshirt's hood. Reed testified that he knew that he did not search her hood, that he violated police department policies, and that violation of the policies led to Palmer's death. Hinson also testified that he placed Palmer in the cell without removing the string in the hooded sweatshirt, thereby violating police department policies. Jones testified that he did not know if the hood of her sweatshirt had a string, but he knew the items that should be removed from detainees and if he saw someone in a cell with an item that should not be in there, it was his responsibility to take it.

Regarding the aggravating circumstances damages awarded against Halbert, he could be charged with the knowledge that failing to monitor Palmer created a potentially dangerous situation and his failure to check on her every ten minutes resulted in her tying the string from

her hooded sweatshirt around her neck, securing the other end to the cell bars and hanging herself. Halbert testified that he understood the communications policy that required that ligatures be removed from inmates, but he stated that he did not consider a sweatshirt string to be a ligature. He also knew that the policy required that inmates be monitored at 10 minute intervals. While he testified that he was watching Palmer on the morning of her death, he admitted that he might have been busy with other duties when she hung herself. He then testified that he did not think it was unusual that Palmer remained motionless for two hours before someone noticed that she was dead. Halbert therefore knew of a potentially dangerous situation created by his failure to monitor, but failed to act to prevent or reduce the danger.

### D. Official Immunity

Defendants claim that they are shielded from personal liability by the doctrine of official immunity. In their memorandum, Defendants appear to be renewing an argument made at the summary judgment stage, rather than during the trial. Defendants did not move for judgment as a matter of law on the issue of official immunity for Defendants Rohrer, Reed, Hinson, Jones or Halbert before the case was submitted to the jury. Rule 50(a)(2) provides, "A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment". Rule 50(b) provides for renewing the motion after trial.

The motion and memorandum before the court is submitted as a Rule 50 motion for judgment as a matter of law, however Defendants failure to include the issue of official immunity at the time of trial results in a waiver of this issue. "The grounds for a renewed motion under Rule 50(b) are limited to those asserted in the earlier Rule 50(a) motion." *Conseco Fin. Serv. Corp., v. N. Am. Mortg. Co.*, 381 F.3d 811, 821 (8th Cir. 2004). Movants cannot use a

Rule 50(b) motion "as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." *Id.* In other words, a movant is precluded from raising an issue in a motion for judgment when the issue was not raised in the motion for directed verdict. *Am. Family Mut. Ins. Co. v. Miell*, 569 F. Supp. 2d 841, 856 (N. D. Iowa 2008).

## E.     MOTION FOR NEW TRIAL

After a jury trial and on motion, the court may grant a new trial on all or some of the issues for any reason, as to any party, for which a new trial has been granted up to this time in an action at law in federal court. Fed. R. Civ. P. 59(a)(1)(A). The decision to grant a new trial lies within the sound discretion of the trial court. *Howard v. Missouri Bone and Joint Center, Inc.*, 615 F.3d 991, 995 (8th Cir. 2010). The court should only grant a motion for a new trial to avoid a miscarriage of justice. *Id.* Inaccuracies or errors should not form the basis for setting aside a verdict unless the error is prejudicial. *Buchholz v. Rockwell Int'l Corp.*, 120 F.3d 146, 148 (8th Cir. 1997).

### 1.     Jury Instructions

"The district court possesses broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity." *Zebley v. Heartland Indus. of Dawson, Inc.*, 625 F.3d 449, 455 (8th Cir. 2010). "In diversity cases, the substance of jury instructions is a matter governed by the applicable state law." *Cedar Hill Hardware and Const. Supply, Inc., v. Insurance Corp. of Hannover*, 563 F.3d 329, 345 (8th Cir. 2009). The jury instructions must, taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case. *American Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 468 (8th Cir. 2013). To constitute reversible error, the error must affect the substantial rights of the parties. *Id.*

Defendants assert that the Court should not have submitted Instruction No. 15, which was based on a modification of Missouri Approved Instructions 20.01, 22.00, 19.01. Instruction 15 states as follows:

> Your verdict must be for plaintiffs Debora Tanner, Danny Palmer, and Callista Baker against defendant Kevin Halbert if you believe:
>
> First, plaintiffs Debora Tanner, Danny Palmer, and Callista Baker are the surviving parents and daughter of Karen Palmer, and
>
> Second, defendant Kevin Halbert failed to adequately monitor Karen Palmer, and
>
> Third, defendant Kevin Halbert was thereby negligent, and
>
> Fourth, such negligence of defendant Kevin Halbert directly caused or directly contributed to cause the death of Karen Palmer.

At the jury instruction conference defense counsel argued that Instruction 15 was a "roving commission" under Missouri law, because there should be some type of specific factual allegations regarding what he failed to monitor." The Court gave instruction 15 over Defendants' objection. In their motion for new trial, Defendants state that Instruction 15 is too vague and fails to conform to the evidence, because it failed to specify when and how Halbert failed to monitor Palmer. Plaintiffs respond that Defendants did not preserve their objections to Instruction 15 and has thereby waived them.

"A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). Assuming for the sake of argument that Defendants did not waive their right to object, they have failed to show there was error in the instruction to the jury. The evidence at

trial showed that Defendant Halbert was charged with monitoring Palmer via video recording system. During the time that he was monitoring her, she committed suicide and hung for two hours, despite Halbert's testimony that he viewed her every ten minutes and thought she was just sitting motionless. Defense counsel makes a specious argument that "once Palmer committed suicide the quality and degree with which Halbert monitored her cell becomes irrelevant as she was already dead" and this instruction allows the jury to speculate and find a failure to monitor in a variety of manners without limitation.

Halbert's own trial testimony affirms that he was bound to follow the Death, Suicide and Homicide policy. The policy states that the Communications Division "shall visually monitor prisoner's behavior while they are in custody. Any suspicious or unordinary behavior shall be reported to the patrol supervisor or in his/her absence the patrol officer's [sic] on duty. Items that may be used to create a ligature shall be taken from all prisoner's (shoe laces), etc." Clearly, Halbert had the duty to monitor Palmer the entire time that she was in custody. Therefore, it was not necessary for the jury instruction to include specific details of when and how Halbert failed to monitor Palmer, because the evidence in the light most favorable to verdict shows that he did not adequately monitor her when she was in custody because he did not notice the ligature visibly hanging from the cell nor did he think that being motionless for two hours was suspicious. The jury instructions, including Instruction 15, taken as a whole, fairly and adequately represented the evidence and applicable law in light of the issues presented to the jury in this case.

### 2. Admission of Expert Testimony

Admission of expert testimony is committed to the broad discretion of the trial court."
*Miles v. General Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001). Federal Rule of Evidence 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"Under Rule 702, it is the trial judge, in admitting expert testimony, who has the gatekeeping responsibility to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *First Union Nat. Bank v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). "Doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility. *Miles*, 262 F.3d at 724. "An expert's opinion must be excluded only if it is so fundamentally unsupported that it can offer no assistance to the jury." *Archer Daniels Midland Co. v. Aon Risk Servs. Inc. of Minn.*, 356 F.3d 850, 858 (8th Cir. 2004).

### a. Admission of Jeff Eiser's Testimony

First, Defendants contend that the Court improperly allowed expert witness Jeff Eiser to express an opinion that Defendants exhibited a conscious disregard for Palmer's safety, because the opinion was not supported by the evidence and expressed the ultimate legal conclusion at

issue on aggravating circumstances. "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. "The touchstone for admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *McKnight by and Through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1408 (8th Cir. 1994). Courts have found that experts invade the province of the jury when the expert opines on the strength of a party's case or credibility of witnesses. *U.S. v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009); *see Securities and Exchange Comm'n v. Shanahan*, No. 4:07-CV-2010 JCH, 2010 WL 415267 at *4 (E.D. Mo. Jan. 26, 2010) (expert's conclusion based on truth of witnesses' descriptions rather than accepted standards or practices in the industry does not assist the trier of fact and must be excluded).

At trial, Eiser's testimony described the national standards for jail administration and prevention of suicide. He gave his professional opinion based on accepted practices and procedures in the correctional community that the Defendants' conduct was in disregard of the safety of Palmer and others and that the failure to remove the ligature and monitor Palmer was a contributing factor in her death. He also testified that the Defendants failed to use ordinary care.

Defendants cite to *Alberternst v. Hunt*, asserting that expert testimony on police practices is generally admissible in § 1983 cases, but the court does not allow experts to offer any legal conclusions that either explicitly or implicitly touch on the ultimate legal issues in the case. *Alberternst v. Hunt*, 4:10-CV-642-JAR, 2011 WL 6140888 at *6 (E.D. Mo. 2011). The Court finds that Alberternst is distinguishable for two important reasons. First, the case at trial did not involve a § 1983 action. Second, unlike the situation in *Alberternst*, few facts were in dispute in this action. All of the defendants, except Halbert, admitted that they violated department policies, failed to remove a ligature from Palmer, and did not know that she had committed

suicide until at least two hours after it occurred despite supposedly checking the video monitor every 10 minutes.

As stated previously by the Court in the pre-trial order denying Defendants' motion to strike Eiser's testimony,

> [B]ecause Plaintiffs cannot provide direct evidence as to why Palmer committed suicide, an expert witness may be used to interpret the facts and data related to her injury and supply the causal link from the injury to her death. *See Kivland*, 331 S.W. 3d at 310. Mr. Eiser's experience as a jail administrator gives him the necessary qualifications to be able to form an opinion as to whether based on industry standards, Defendants' actions or inactions contributed to Palmer's suicide.

It was within the jury's province to believe or disbelieve Eiser's testimony and determine the weight to give Eiser's testimony in light of the fact that he is not a medical doctor.

Next, Defendants contend that Eiser's testimony was improper because his opinions embraced the application of the policies of the Sullivan Police Department rather than the judgment of the individual defendants. Specifically, the defendants contend that his opinions that Defendants breached a national standard of care by not checking on Palmer in person and criticized the Defendants for deficiencies in the Sullivan Police Department's inmate screening were improper. Eiser testified regarding each defendant's actions and his opinion as to how their actions failed to meet accepted jail practices and procedures. He testified, in agreement with the Defendants, that they violated the policies of the Sullivan Police Department. Further, the Court finds that if there was any error, it was harmless as the evidence against Defendants was overwhelming.

### b.    Admission of Deposition Testimony of Pat Keohane

Defendants assert that the reading of the deposition testimony of Pat Keohane was improper, because he was evaluating the case from the perspective of what the policies of the Sullivan Police Department should have been.  Defendants also assert that the fashion in which Plaintiffs set up and read the testimony could have inadvertently misled the jury as to the context of the criticisms in his testimony.  The Court finds that Defendants' arguments lack merit. Defendants were free to provide the appropriate context, for Keohane's opinion, if they felt that the way the Plaintiffs read the testimony could mislead the jury.  Defendants failed to do so.

Based on the foregoing, the Court finds that the admission of the expert testimony was proper.

### 3.    Admission of Evidence

A district court's rulings on admissibility of evidence are entitled to great deference. *Safety Nat. Cas. Corp. v. Austin Resolutions, Inc.*, 639 F.3d 498, 503 (8th Cir. 2011).  "Moreover, a jury's verdict will not be disturbed absent a showing that the evidence was so prejudicial as to require a new trial which would be likely to produce a different result." *Id.*

### a.    Admission of Enlarged Video

Defendants assert that the Court committed error by allowing the admission of an enlarged video presentation of the video footage of Palmer's jail cell.  Defendants contend that playing the enlarged video in isolation to the jury created the wrong impression of what Halbert was viewing when Palmer killed herself.  The Court finds that the showing of the enlarged video footage of Palmer's jail cell was not prejudicial to the Defendants.  During his testimony, Halbert explained that the video monitoring system provided views of one, four, six, eight, ten, or twelve

screens at once. He testified that the sizes can be adjusted and enlarged, although enlarging a picture can make it blurry or fuzzy. On cross-examination from defense counsel, Halbert testified that at the time he was supposed to be monitoring Palmer, he had the monitor in a four screen view. He testified that each quadrant was roughly three by three inches. Halbert noted that the size of his jail monitor was 17 inches and the size of the courtroom monitor was 42 inches. Halbert also testified that the view on the jail monitor did not take up the entire 17 inch screen. Moreover, Defendants entered Exhibit GG into evidence, which purported to depict a sample view of how the four screens would have looked on the date of Palmer's death.

Based on the evidence presented at trial, it was clear to the jury that the television monitor in the courtroom was more than twice the size of the monitor used by Halbert at the jail and that the view of any individual cell was even smaller when viewing four screens. It is highly unlikely that the jury verdict would have been different, if the jury had not seen an enlarged version of the video of Palmer's jail cell.

### b. Admission of Exemplar Sweatshirt

Defendants also assert that it was prejudicial to admit "an exemplar sweatshirt," because it contained an exposed drawstring when there was no evidence that Palmer's sweatshirt had an exposed drawstring. The Court finds that the admission of the exemplar sweatshirt was not prejudicial. Corporal Scott Mertens testified regarding the differences between the exemplar sweatshirt and the actual sweatshirt that Palmer wore at the time of her death, which was identified in pictures entered into evidence. Mertens testified that the sweatshirts were substantially similar in color, but the lettering on the sweatshirts was different. He showed the jury the string that was used in the actual hanging. On cross-examination, defense counsel repeatedly had Mertens affirm the differences between the exemplar sweatshirt and Palmer's

sweatshirt.  Further, all of the defendants testified that they did not see a string hanging from Palmer's hood or did not recall seeing one.  Based on the overwhelming evidence against the defendants, it is unlikely the jury's verdict would have been different if the exemplar sweatshirt had not been admitted.

### 4.  Remittitur

Defendants assert that they are entitled to a remittitur, or new trial on liability and damages, because the jury's verdict is against the weight of the evidence and the jury's damage award is excessive in that the verdict vastly exceeded any measure of fair and reasonable compensation for Plaintiffs' incurred damages.  The consideration of a motion for remittitur is within the discretion of the trial court.  *Mathieu v. Gopher News Co.*, 273 F.3d 769, 782 (8th Cir. 2001).  "Remittitur is appropriate only when the verdict is so grossly excessive as to shock the conscience of the court."  *Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923, 931 (8th Cir. 2010).  "A verdict is considered grossly excessive when there is a plain injustice or a monstrous or shocking result."  *Hudson v. United Sys. of Arkansas, Inc.*, 70 F.3d 700, 705 (8th Cir. 2013).

### a.  Liability

"When presented with a question as to whether a state law claim damage award is excessive, state substantive law guides [the] review."  *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 960 (8th Cir. 2007).  "In Missouri, courts generally defer to the jury's decision concerning the amount of damages, and only overturn a jury's verdict when the defendants demonstrate that (1) some event occurred at trial that incited the bias and prejudice of the jury and (2) the verdict is so grossly excessive so as to shock the conscience of the court."  *Synergetics*, 477 F.3d at 960. "Actual damages awards will not be disturbed unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive."  *Id.*

Defendants assert that evidence does not support the award of $1,300,000 dollars in actual damages. Defendants assert that the economic loss suffered by Palmer's daughter Calista Baker was at most $108,000.00, which would come to approximately $6,000 per year up to her 18th birthday. Defendants base the $6,000.00 figure on the approximate amount of money that Palmer earned during the last three years of her life.

The Court finds that the jury's award of $1.3 million dollars in damages was not excessive. In wrongful death actions, Missouri law provides

> The trier of the facts may give to the party or parties entitled thereto such damages as the trier of facts may deem fair and just for the death and loss thus occasioned having regard to the pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death and without limiting such damages to those which would be sustained prior to attaining the age of majority by the deceased or by the person suffering any such loss.

Mo. Rev. Stat. § 537.090.

In this case, Calista Baker is not the only plaintiff; Palmer's parents Deborah Tanner and Danny Palmer are also plaintiffs. "In determining damages, the fact finder considers losses with references to the particular person on whose behalf the suit was brought and the relationship of the deceased with those particular persons." *Evans v. FirstFleet, Inc.*, 345 S.W.3d 297, 305 (Mo. Ct. App. 2011). The presence of multiple parties can work to increase the total compensatory award. *Id.*

Next, as stated in the statute, the jury is not limited to only awarding damages based on the amount of income Palmer earned during her lifetime or only to compensate Baker until she is eighteen. Mo. Rev. Stat. § 537.090. The jury is allowed to award the damages it deems fair and

just for consortium, companionship, comfort, instruction, guidance, counsel, training, and support. *Id.* "The physical, emotional, and psychological relationship between a parent and child must be considered when computing the loss of consortium for the loss of a parent for a child or the loss of a child for a parent." *Evans,* 345 S.W.3d at 305. There is no bright line amount for those types of considerations. *Id.* Further, the jury is also not limited to providing damages to Calista until she reaches the age of eighteen. Mo. Rev. Stat. § 537.090.

Defendants contend that they are entitled to a new trial on damages, because they were limited and precluded from entering into evidence relevant portions of Palmer's life involving criminal activity that were central to her relationship with Callista and such evidence was relevant to the "true loss" suffered by Callista. Defendants' argument lacks legal merit. There was evidence at trial that Palmer was a drug addict, had been kicked out of family members' homes, including her mother's home, and had been arrested more than once. Palmer's incarceration at the Sullivan jail was a central part of this case. There was also evidence that Palmer had a period of time where she had strained relationships with her parents. Cumulative evidence regarding Palmer's past criminal activity would not have affected the jury's award of damages. Moreover, such evidence is irrelevant as "the statute requires the court to consider what the plaintiff has been deprived of by reason of the decedent's death, not only what the decedent has failed to provide to date." *Evans*, 345 S.W.3d at 306. The benefits of a parent child relationship "are not always susceptible of measurement simply by referencing the frequency of contact and the time of association." *Id.*

Finally, an award of $1,300,000 is not excessive compensatory damages for a decedent's child and parents and does not shock the conscience. *See Evans*, 345 S.W.3d at 306-307 ($1,000,00 in compensatory damages to decedent's son and mother not excessive and remittitur

denied); *Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 338, 344 (Mo. Ct. App. 2000) ($4,500,000 damages award to decedent's parents not excessive and remittitur denied). Defendants' motion for remittitur regarding actual damages is denied.

### b.    Aggravating Circumstances Damages

Defendants contend that the imposition of aggravating circumstances damages was grossly unwarranted and excessive. Because aggravating circumstances damages in Missouri are to be treated as punitive damages, the constitutional due process protections apply. *Bennett*, 896 S.W.2d at 466. The U.S. Supreme Court relies upon three guideposts to determine whether a punitive damages award is excessive: (1) the degree of reprehensibility of the conduct; (2) the disparity between the harm suffered by Plaintiffs and the punitive damages award, and (3) the difference between the remedy and civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-575 (1996). To determine reprehensibility of conduct, courts must consider whether the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). There is no concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award, although few awards exceeding a single digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. *Campbell*, 538 U.S. at 424-425.

The Court notes that Defendants cite no case law to support their assertion that the award of aggravating circumstances damages was excessive. The Court finds that aggravating

circumstances damages were properly awarded in this action and the award was not excessive. Defendants' conduct was reprehensible, because it resulted in Palmer's death and showed an indifference to or reckless disregard of Palmer's health or safety. Further, the ratio of compensatory damages to punitive damages is 1:1. Therefore, the Court will deny Defendants' request for remittitur regarding the award of aggravating circumstances damages.

## V.      Conclusion

Based on the foregoing, the Court will deny Defendants' Rule 50 Motion for Judgment as a Matter of Law or in the Alternative Rule 59 Motion for Remittitur or New Trial.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Rule 50 Motion for Judgment as a Matter of Law or in the Alternative Rule 59 Motion for Remittitur or New Trial is **DENIED**. [Doc. 213].

Dated this 28th day of June, 2013.

    /s/ Nannette A. Baker           
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE